UNITED STATES BANKRUPTCY COURT        **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 (Confirmed) |
| M. FABRIKANT & SONS, INC., <u>et al.</u>, | : | Case No. 06-12737 (SMB) |
| | : | and 06-12739 (SMB) |
| | : | Jointly Administered |
| Reorganized Debtors. | : | |

-------------------------------------------------------------X

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF M. FABRIKANT & SONS, | : | |
| INC.; AND FABRIKANT-LEER, | : | |
| INTERNATIONAL, LTD. | : | |
| | : | |
| Plaintiff, | : | |
| -- against -- | : | Adv. Proc. No.: 07-02780 |
| | : | |
| JP MORGAN CHASE BANK, N.A.; ABN AMRO | : | |
| BANK N.V.; BANK OF AMERICA, N.A.; HSBC | : | |
| BANK USA, NATIONAL ASSOCIATION; BANK | : | |
| LEUMI USA; ISRAEL DISCOUNT BANK OF | : | |
| NEW YORK; ANTWERPSE DIAMANTBANK, | : | |
| N.V.; SOVEREIGN PRECIOUS METALS, LLC; | : | |
| AND SOVEREIGN BANK, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## MOTIONS TO DISMISS COMPLAINT

**A P P E A R A N C E S :**

SUSMAN GODFREY LLP
Attorneys for the Official Committee of Unsecured Creditors
654 Madison Avenue
New York, New York 10065

      Stephen D. Susman, Esq.
      Jacob W. Buchdahl, Esq.
      Jonathan J. Ross, Esq.
         Of Counsel

HAHN & HESSEN LLP
Attorneys for JPMorgan Chase Bank, N.A.
488 Madison Avenue
New York, New York 10022

      Steven J. Mandelsberg, Esq.
      Joshua I. Divack, Esq.
      Charles Loesner, Esq.
         Of Counsel

CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for ABN Amro Bank N.V.
One World Financial Center
New York, New York 10281

      Evan R. Fleck, Esq.
      Gregory M. Petrick, Esq.
      Ingrid Bagby, Esq.
      Peter M. Friedman, Esq.
         Of Counsel

REIMER & BRAUNSTEIN LLP
Attorneys for Bank of America, N.A.
Three Center Plaza, 6th Floor
Boston, Massachusetts 02108

      Paul S. Samson, Esq.
      Meegan B. Casey, Esq.
      Jeffrey D. Ganz, Esq.
         Of Counsel

PHILLIPS LYTLE LLP
Attorneys for HSBC Bank USA
437 Madison Avenue, 34th Floor
New York, New York 10022

      William J. Brown, Esq.
      Paul K. Stecker, Esq.
      Allan L. Hill, Esq.
         Of Counsel

HERRICK, FEINSTEIN LLP
Attorneys for Bank Leumi USA
2 Park Avenue
New York, New York 10016

> Andrew C. Gold, Esq.
> Frederick E. Schmidt, Esq.
> Of Counsel

HELLER EHRMAN LLP
Attorneys for Israel Discount Bank of New York
Times Square Tower
7 Times Square
New York, New York 10036

> Timothy Mehok, Esq.
> Erin McMurray-Killelea, Esq.
> Andrew Levine, Esq.
> Of Counsel

CULLEN AND DYKMAN LLP
Attorneys for Antwerpse Diamantbank, N.V.
100 Quentin Roosevelt Boulevard
Garden City, New York 11530

> Matthew G. Roseman, Esq.
> Matthew D. Brown, Esq.
> Of Counsel

MILBANK, TWEED, HADLEY & McCLOY LLP
Attorneys for Sovereign Precious Metals, LLC and Sovereign Bank
1 Chase Manhattan Plaza
New York, New York 10005

> Douglaw W. Henkin, Esq.
> Wilbur F. Foster, Jr., Esq.
> Robert R. Miller, Esq.
> Alan J. Stone, Esq.
> Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

This lawsuit arose out of the bankruptcy of M. Fabrikant & Sons, Inc. ("MFS")

and Fabrikant-Leer International, Ltd. ("FLI," and collectively with MFS, the debtors or

"Fabrikant"). In the main, the Amended Complaint, dated March 27, 2008 (ECF Doc. #

54), seeks to avoid the pre-petition obligations owed by the debtors to the defendant

banks (other than Sovereign Bank), and to avoid and recover the value of the liens

granted to secure those obligations.  The Official Committee of Unsecured Creditors of

MFS and FLI (the plaintiff or the "Committee") also seeks to recover the value of gold

that MFS purchased from Sovereign Precious Metals, LLC ("SPM") and transferred to

another company operated by its principals.  Lastly, the Amended Complaint asserts

claims against four of the defendant banks as subsequent transferees of fraudulent

transfers.

Each defendant moved to dismiss the Complaint.[1]  For the reasons that follow,

Counts I through IV are dismissed.  In addition, those portions of Counts V through VII

that allege actual fraudulent transfers are dismissed.  Finally, the plaintiff is granted leave

to replead.

## BACKGROUND

The background information is derived from the allegations of the Amended

Complaint.  MFS is a New York corporation, (¶ 5),[2] that had engaged in the diamond and

jewelry business since 1895, and for many years, was one of the largest and most

prominent diamond and jewelry wholesalers in the world.  (¶ 17.)  In 2005, MFS

established FLI, also a New York corporation, (¶ 6), to act as a distributor and wholesaler

of "low end" finished jewelry.  MFS owns 82% of the FLI stock.  (¶ 18.)

---

[1]    The Committee filed its initial Complaint on October 1, 2007.  (ECF Doc. # 1.)  After the
defendants moved to dismiss, the Committee filed its Amended Complaint to add defendant Sovereign
Bank.  The Amended Complaint otherwise mirrored the Complaint.  The Court has treated the motions as if
they were directed at the Amended Complaint.

[2]    The parenthetical notation "(¶ _)" refers to the paragraphs in the Amended Complaint.

Charles Fortgang and his son, Matthew Fortgang, own approximately 32% of the stock of MFS.  (¶ 18.)  The remainder of stock is owned, through a trust, by Marjorie Fortgang and Susan Fortgang and by employees or former employees of MFS.  (¶ 18.)  At all relevant times, Charles, as chairman, and Matthew, as President, controlled MFS and FLI.  (¶ 18.)

In addition, Charles and Matthew Fortgang, and trusts of which Charles, Matthew, and Susan Fortgang were beneficiaries, owned a group of 47 companies (the "Fortgang Affiliates") engaged in the diamond and jewelry business.  (¶ 20; see Amended Complaint at Ex. A.)  With few exceptions, neither of the debtors had an ownership interest in any of the Fortgang Affiliates. (¶ 20.)

MFS became insolvent no later than January 2003, (¶ 21), and FLI became insolvent no later than January 13, 2006.  (¶ 22.)  They filed their voluntary chapter 11 petitions in this Court on November 17, 2006 (the "Petition Date").

**A.    The "Scheme" Transactions (Counts I through IV)**

**1.    The Debtors and the Pre-Petition Banks**

The thrust of Counts I through IV involves a scheme engineered by Charles and Matthew Fortgang through which MFS and FLI borrowed money from the defendant banks (other than Sovereign Bank) and then reconveyed the loan proceeds to the Fortgang Affiliates for inadequate or no consideration.  For many years prior to the Petition Date, the debtors engaged in independent lending relationships with a number of financial institutions.  They included the defendants, J.P. Morgan Chase Bank, N.A. ("JPMC"), ABN AMRO Bank N.V. ("ABN"), Bank of America ("BOA"), HSBC Bank

USA, N.A. ("HSBC"), Bank Leumi USA ("BL"), Israel Discount Bank of New York

("IDB"), Antwerpse Diamantbank, N.V. ("ADB," and collectively, the "Pre-Petition

Banks").  According to the Amended Complaint, the Pre-Petition Banks made the

following aggregate loans to Fabrikant between January 2003 and the Petition Date:

| Pre-Petition Bank | Amount of Obligation Incurred |
|---|---|
| JPMC | $35,838,000 |
| ABN | $44,290,000 |
| BOA | $10,475,000 |
| HSBC | $12,075,000 |
| BL | $11,592,000 |
| IDB | $9,660,000 |
| ADB | $5,454,000 |
|  | **$129,384,000.00** |

(¶¶ 32-33, 54, 61.)

    The loans were initially made on an unsecured basis.  In October 2004, the Pre-

Petition Banks took security interests in all of the debtors' assets to protect themselves,

and shift the detrimental effects of the fraudulent transfers to the unsecured creditors.  (¶

47.)   On January 13, 2006, MFS guaranteed the $8.5 million debt FLI owed to

defendants ABN and BL.  (¶ 34.)  On that same day, FLI guaranteed $92 million of then

existing obligations owed by MFS to the Pre-Petition Banks.  This amount comprised all

of MFS' pre-existing obligations to the Pre-Petition Banks during the two-year period

preceding the Petition Date.  (Id. at ¶ 35.)

During this same period – January 2003 to the Petition Date – MFS advanced the

net amount of $175.3 million to the Fortgang Affiliates (the "Affiliate Transfers").  (¶¶

27, 40.)  Fabrikant funded the transfers to the Fortgang Affiliates, at least in part, with the

money borrowed from the Pre-Petition Banks.  (¶ 32.)  MFS made many of the transfers

prior to the date the Fortgang Affiliates repaid the Pre-Petition Banks on account of their

own loan obligations.  (¶ 23.)  Similarly, the Fortgang Affiliates transferred significant

sums back to MFS in advance of MFS' loan pay-down obligations to the Pre-Petition

Banks.[3]  (¶ 24.)  However, MFS never came close to fully repaying its debts owed to the

Pre-Petition Banks after January 2003.  (¶ 31.)

### 2.    The Debtors and SPM

In a separate transaction on July 7, 2006, MFS and FLI became jointly and

severally obligated to SPM in the amount of $32 million on account of MFS' purchase of

gold from SPM.[4]  (¶¶ 32, 37.)  At least $22 million had already been delivered to

Fortgang Affiliates, and the purchase was made for their benefit.  (¶ 38.)  The Amended

---

[3]    The plaintiff alleges that MFS and the Fortgang Affiliates transferred money back and forth on an "as needed" basis to clear up their balance sheets and fund their respective loan repayments.  (See ¶¶ 23-24.)

[4]    The SPM transaction is spelled out in documents attached to the Declaration of Robert R. Miller in Support of Defendant Sovereign Precious Metals, LLC's Motion to Dismiss the Complaint, dated December 10, 2007, ("Miller Decl.") (ECF Doc. # 34).  On July 7, 2006, MFS purchased gold from SPM pursuant to the Eighth Amendment to Amended and Restated Consignment Agreement dated as of December 31, 1998.  (See Miller Decl. at Ex. E.)  In substance, Sovereign Bank loaned MFS up to $33 million to purchase 50,760 fine troy ounces of gold that SPM had consigned to MFS under an earlier consignment agreement.  (Id. at ¶ 4.)  The Eighth Amendment to Amended and Restated Consignment Agreement also "grant[ed] and reconfirm[ed]" the security interest that had been granted on January 13, 2006.  (Id. at ¶ 6.)

Complaint also indicates that as of the Petition Date, the SPM claim was secured.  (See ¶ 51.)

### 3.    The Fraudulent Nature of the Scheme

The plaintiff alleges that the Affiliate Transfers were made with actual fraudulent intent.  (¶ 41.)  In the alternative, the Affilate Transfers were made with constructive fraudulent intent because the debtors did not receive fair consideration or reasonably equivalent value in exchange for the obligations they incurred to the Pre-Petition Banks and SPM.  (See ¶ 57.)

The plaintiff further alleges that the Pre-Petition Banks and SPM made the loans or extended the credit that funded the improper transfers to the Fortgang Affiliates in disregard of their actual or constructive knowledge of the facts that rendered those transfers fraudulent transfers.  (¶ 45.)  From at least January 2003, the Pre-Petition Banks and SPM knew that MFS did not own the Fortgang Affiliates, that a substantial portion, if not virtually all, of the funding provided by the Pre-Petition Banks would be transferred to the Fortgang Affiliates, (¶ 42), and that the receivables generated by the Affiliate Transfers were virtually worthless.  (¶ 43.)  The Pre-Petition Banks and SPM nevertheless made the transfers to maintain their reputations "as the premier lenders to the international jewelry and diamond industry," and to placate Charles and Matthew Fortgang, who "would not allow MFS to do business with them if they attempted to restrict transfers to Fortgang Affiliates."  (¶ 45.)  The Pre-Petition Banks and SPM also believed that they could protect themselves by obtaining the personal guaranties of Matthew and Charles Fortgang, and thereafter, liens on all of the debtors' assets.  (¶ 45.)

**B.      The Subsequent Transfers (Counts V through VII)**

As noted earlier, the Fortgang Affiliates also borrowed directly from five of the seven Pre-Petition Banks.  (¶ 29.)  From January 2006 until the Petition Date, Fabrikant made actual or constructive fraudulent transfers in the aggregate amount of $38,890,000 to the following Fortgang Affiliates: Alpha Diamond Co., Inc. ("Alpha Diamond"), Diamfab PVBA ("Diamfab"), Fabrikant Trading India, and Fabrikant HK Trading Ltd. ("Fabrikant HK").  (¶¶ 76, 84.)  These Fortgang Affiliates used these transfers to pay the Pre-Petition Banks the following amounts[5]:

| Pre-Petition Bank | Aggregate Transfers |
|---|---|
| ABN | $8,364,265 |
| HSBC | $14,025,784 |
| IDB | $5,946,592 |
|  | **$28,336,641.00** |

In addition, between January 2005 and the Petition Date, Fabrikant made actual or constructive fraudulent transfers in the aggregate amount of $10,535,000 to VSI, LLC ("VSI"), another Fortgang Affiliate.  (¶¶ 78, 86.)  VSI used these transfers to pay $9,882,351 to defendant Sovereign Bank in satisfaction of its own debts.  (¶¶ 79, 87.)

**C.      The Post-Petition Bankruptcy Sale**

As of the Petition Date, the Pre-Petition Banks and SPM held secured claims against the debtors in the sum of $161.3 million.  (¶ 51.)  The debtors acknowledged

---

[5]      See ¶¶ 77, 85.

these claims in the Final Order Authorizing Debtors' Use of Cash Collateral and Granting

Adequate Protection Claims and Liens, dated December 18, 2006 (the "FCCO")(filed in

Case No. 06-12737 ECF Doc. # 93) subject to the Committee's right to object.[6]  (Id.)

After the Petition Date, each of the defendants sold their secured claims.  (Id.)

On May 21, 2007, all of MFS' remaining assets were sold at an auction.  (¶ 52.)

Wilmington Trust Company, the agent for the purchasers of the secured debt, purchased

the majority of the assets for $38.5 million.  (Id.)  Surya Capital purchased the remaining

assets for $10.4 million.  (Id.)

**D.    This Adversary Proceeding**

The Amended Complaint seeks to avoid the fraudulent transfers and obligations

made or incurred by the debtors, and recover their value for the benefit of the unsecured

creditors.  The Amended Complaint is divided into two parts, and contains the following

seven claims for relief:

---

[6]     The defendants appear to argue that the debtors' admissions in the FCCO restrict the plaintiff, or at a minimum, impose a higher pleading standard.  (Joint Reply Memorandum of Law in Further Support of Defendants' Motions to Dismiss Complaint, dated Mar. 4, 2008, at 19-20)(ECF Doc. # 48.)  The FCCO allowed the Committee to commence this avoidance and recovery action notwithstanding the debtors' release of the defendants.  (FCCO at ¶ 22.)  Such clauses are commonly included in cash collateral orders to balance the lender's desire for a release, as the quid pro quo for its consent to the use of its cash collateral, against the need to protect the interests of the unsecured creditors, particularly at an early stage of the case before there is an opportunity to confirm the validity and extent of the liens.  Here, the Committee's right to challenge the pre-petition transactions between the debtors and the defendants would be a hollow one if the Committee was hamstrung by the admissions made by the debtors in the FCCO. Instead, this adversary proceeding necessarily proceeds as if the debtors never made the admissions and concessions in the FCCO.

| Count | Defendant(s) | Description of Claim(s) |
|---|---|---|
| 1 | Pre-Petition Banks and SPM | Avoiding, under 11 U.S.C. § 544, the obligations incurred by the debtors in the amounts of $44,290,000 to ABN; $12,075,000 to HSBC, $9,660,000 to IDB; $5,454,000 to ADB; $11,592,000 to BL; $10,475,000 to BOA; $35,838,000 to JPMC; and $32,000,000 to SPM. (¶¶ 54-60.) |
| 2 | Pre-Petition Banks and SPM | Avoiding, under 11 U.S.C. § 548, the obligations incurred by FLI in the amounts of $44,290,000 to ABN; $12,075,000 to HSBC, $9,660,000 to IDB; $5,454,000 to ADB; $11,592,000 to BL; $10,475,000 to BOA; $35,838,000 to JPMC; and $32,000,000 to SPM.  (¶¶ 61-65.) |
| 3 | Pre-Petition Banks and SPM | Avoiding, under 11 U.S.C. § 548, the obligations incurred by MFS in the amounts of $16,790,000 to ABN; $2,075,000 to HSBC, $9,660,000 to IDB; $1,521,628 to ADB; $4,592,000 to BL; $5,075,000 to BOA; $22,338,000 to JPMC; and $32,000,000 to SPM.  (¶¶ 66-70.) |
| 4 | Pre-Petition Banks and SPM | Avoiding the liens securing the fraudulent obligations alleged in Counts I through III, and recovering the value of the collateral received by the defendants from the debtors under 11 U.S.C. § 550. (¶¶ 71-75.) |
| 5 | ABN, IDB, HSBC and Sovereign Bank | Avoiding, under 11 U.S.C. § 544, the transfers in the amounts of $14,025,784 to HSBC, $8,364,265 to ABN, $5,946,592 to IDB and $9,882,351 to Sovereign Bank.  (¶¶ 76-83.) |
| 6 | ABN, IDB, HSBC and Sovereign Bank | Avoiding, under 11 U.S.C. § 548, the transfers in the amounts of $14,025,784 to HSBC, $8,364,265 to ABN, $5,946,592 to IDB and $9,882,351 to Sovereign Bank.   (¶¶ 84-92.) |
| 7 | ABN, IDB, HSBC and Sovereign Bank | Recovering, under 11 U.S.C. § 550(a), the value of the payments made by the Fortgang Affiliates to defendants ABN, IDB, HSBC and Sovereign Bank, in amounts to be determined at trial. (¶¶ 93-98.) |

**E.    The Motions to Dismiss**

Each defendant moved separately to dismiss the Complaint.[7]  The plaintiff concedes that the first four claims for relief depend upon a "collapsing" theory under which the Pre-Petition Banks and SPM should be held liable for the reconveyance of the loan proceeds or gold to the Fortgang Affiliates.  (See Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint in its Entirety and with Prejudice, dated Feb. 4, 2008 ("Opposition Memo"), at 39-40)(ECF Doc. # 47.)  The defendants (other than Sovereign Bank) argue that the plaintiffs have failed to plead the necessary elements to collapse the transactions.  The defendants implicated in the last three claims point to several pleading deficiencies, and also contend that the plaintiff cannot avoid and recover the subsequent transferors unless it avoids the initial transfer to the Fortgang Affiliates.

**DISCUSSION**

On a motion to dismiss a complaint under FED. R. CIV. P. 12(b)(6), a court must "accept all factual allegations in the complaint as true," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007); accord Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), even if the allegations are doubtful in fact.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).  The factual allegations must nevertheless be plausible, In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007); Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.

---

[7]      See note 1 supra.

2007), cert. granted sub nom. Ashcroft v. Iqbal, 128 S. Ct. 2931 (2008), and "raise a right

to relief above the speculative level." Bell Atl. Corp., 127 S. Ct. at 1965; accord ATSI

Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "[L]abels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

Bell Atl. Corp., 127 S. Ct. at 1965; accord Paycom Billing Servs. v. Mastercard Int'l,

Inc., 467 F.3d 283, 289 (2d Cir. 2006)("we do not 'permit conclusory statements to

substitute for minimally sufficient factual allegations.'")(quoting Furlong, M.D. v. Long

Island Coll. Hosp., 710 F.2d 922, 927 (2d Cir.1983)); Amron v. Morgan Stanley Inv.

Advisors Inc., 464 F.3d 338, 344 (2d Cir. 2006)("bald assertions and conclusions of law

will not suffice" to defeat a motion to dismiss (internal quotation marks omitted)).

Instead, the plaintiff must "amplify a claim with some factual allegations in those

contexts where such amplification is needed to render the claim plausible." Iqbal, 490

F.3d at 157-58 (emphasis in original). "[O]nce a claim has been stated adequately, it may

be supported by showing any set of facts consistent with the allegations in the

complaint." Bell Atl. Corp., 127 S. Ct. at 1969; accord Roth v. Jennings, 489 F.3d 499,

510 (2d Cir. 2007).

        "[C]ourts must consider the complaint in its entirety, as well as other sources

courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." Tellabs, 127 S. Ct. at 2509. Courts may also consider "any

written instrument attached to the complaint, statements or documents incorporated into

the complaint by reference, legally required public disclosure documents filed with the

SEC, and documents possessed by or known to the plaintiff and upon which it relied in

bringing the suit." <u>ATSI Commc'ns</u>, 493 F.3d at 98; <u>accord</u> <u>Roth</u>, 489 F.3d at 509;

<u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002); <u>Rothman v.</u>

<u>Gregor</u>, 220 F.3d 81, 88-89 (2d Cir. 2000).  "Where a plaintiff's conclusory allegations

are clearly contradicted by documentary evidence incorporated into the pleadings by

reference, however, the court is not required to accept them." <u>Labajo v. Best Buy Stores,</u>

<u>L.P.</u>, 478 F. Supp.2d 523, 528 (S.D.N.Y. 2007); <u>accord</u> <u>Kuhne v. Midland Credit Mgmt.,</u>

<u>Inc.</u>, No. 06 Civ. 5888(DC), 2007 WL 2274873, at *1 (S.D.N.Y. Aug. 09, 2007);

<u>Matusovsky v. Merrill Lynch</u>, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

A.      **Counts I through IV**

As noted, Counts I through IV hinge on the applicability of the doctrine of

collapsing.  Under appropriate circumstances, multiple transactions will be collapsed and

treated as steps in a single transaction for analysis under the fraudulent conveyance laws.

<u>HBE Leasing Corp. v. Frank</u>, 48 F.3d 623, 635 (2d Cir. 1995); <u>Orr v. Kinderhill Corp.</u>,

991 F.2d 31, 35 (2d Cir. 1993)("[A]n allegedly fraudulent conveyance must be evaluated

in context; [w]here a transfer is only a step in a general plan, the plan must be viewed as a

whole with all its composite implications.")(internal quotation marks and citations

omitted).  Although collapsing is usually applied to leveraged buyouts, the doctrine

applies more generally to the following "paradigmatic scheme":

> one transferee gives fair value to the debtor in exchange for the debtor's
> property, and the debtor then gratuitously transfers the proceeds of the first
> exchange to a second transferee. The first transferee thereby receives the
> debtor's property, and the second transferee receives the consideration,
> while the debtor retains nothing.

<u>HBE Leasing</u>, 48 F.3d at 635.

A party seeking to collapse a series of transactions must satisfy two elements, or prongs. First, "the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors." Id. If the debtor retains the consideration, or transfers it for valuable consideration, its estate is not unfairly diminished and the initial transfer is not fraudulent. Id.

Second, the initial transferee must have actual or constructive knowledge of the entire scheme that renders the exchange with the debtor fraudulent. Id.; accord In re Best Prods. Co., Inc., 168 B.R. 35, 56-57 (S.D.N.Y. 1994)(courts frequently examine the defendant's knowledge "of the structure of the entire transaction and . . . whether its components were part of a single scheme")(internal quotation marks and citation omitted); Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.), 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002)("Courts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction."). Actual knowledge exists where the "initial transferor was intimately involved in the formulation or implementation of the plan by which the proceeds of the loan were channeled to the third-party." Sunbeam, 284 B.R. at 370. Constructive knowledge, on the other hand, will be found where the initial transferee became aware of circumstances that should have led it to inquire further into the circumstances of the transaction, but failed to make the inquiry. HBE Leasing, 48 F.3d at 636.

Counts I through III seek to invalidate the loan and purchase obligations under the fraudulent transfer provisions of New York and federal bankruptcy law.  The Pre-Petition Banks and SPM have, however, assigned their claims and related security interests, and no longer assert them against the debtors or their estates.  Furthermore, the debtors settled with the assignees under the confirmed chapter 11 plan, and are not challenging the debts or liens in their hands.  Thus, the mere avoidance of the obligations would not provide any meaningful relief.

The validity of the loan obligations is nevertheless crucial to Count IV.  Asserted solely as a constructive fraudulent transfer claim, Count IV seeks to avoid and recover the value of the liens conveyed to the Pre-Petition Banks and SPM to secure the repayment of the obligations.  A valid antecedent debt provides adequate consideration to support the grant of a security interest.  Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 599 N.Y.S.2d 816, 819 (N.Y. App. Div. 1993)("Even though insolvent, a debtor may properly assign assets to a creditor as security for an antecedent debt although the effect of the transfer will be to prefer that creditor."); see Geron v. Palladin Overseas Fund, Ltd. (In re Applied Theory Corp.), 330 B.R. 362, 363 (S.D.N.Y. 2005)("In its appeal, the appellant urges us to reject the per se rule consistently applied in this District, which provides that a debtor's grant of a security interest in its assets to a lender who has previously given the debtor a cash loan may not be considered a fraudulent conveyance.").   The plaintiff must, therefore, invalidate the obligations to avoid and recover the value of the corresponding liens.

With this in mind, we turn to the elements of the debtors' collapsing claim.

### 1.    The First Prong

To satisfy the first prong of the collapsing doctrine, the plaintiff must plead and ultimately prove that (1) the Pre-Petition Banks and SPM transferred consideration to the debtors; (2) the debtors reconveyed the consideration to the Fortgang Affiliates; and (3) the reconveyance of the loan proceeds and gold was made with actual or constructive fraudulent intent within the meaning of the fraudulent transfer laws.  The Amended Complaint alleges that the debtors received at least $129.4 million in loan proceeds from the Pre-Petition Banks and another $32 million worth of gold from SPM, and incurred corresponding obligations.  In addition, the Amended Complaint alleges that the debtors retransferred the $129.4 million, as part of their net transfer of over $175 million, to the Fortgang Affiliates.  Finally the Amended Complaint alleges that MFS reconveyed $22 million worth of the SPM gold, which was already in the possession of the Fortgang Affiliates at the time of the sale.

The parties debate the degree of specificity that these allegations must meet.  In particular, they argue over the need to particularize each transfer.  The sufficiency of the transfer allegations in the Amended Complaint depends on whether the plaintiff is relying on theories of actual or constructive fraud, and is discussed immediately below.

### a.    Actual Fraud

The plaintiff contends that the Affiliate Transfers were made with actual fraudulent intent under both New York and bankruptcy law, and hence, may be set aside without regard to the adequacy of any consideration received by the debtors.  A claim to avoid an intentional fraudulent conveyance or transfer must satisfy the pleading

requirements of Rule 9(b) of the Federal Rules of Civil Procedure.[8]  Sharp Int'l Corp. v.

State Street Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 56 (2d Cir. 2005);

Atlanta Shipping Corp., Inc. v. Chem. Bank, 818 F.2d 240, 251 (2d Cir. 1987); Nisselson

v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.), 222 B.R. 417, 428

(Bankr. S.D.N.Y. 1998).  Rule 9(b) requires the plaintiff to plead claims of actual or

intentional fraud with particularity.

 The party asserting an intentional fraudulent transfer claim must "specify the

property that was allegedly conveyed, the timing and frequency of those allegedly

fraudulent conveyances, [and] the consideration paid."  United Feature Syndicate, Inc. v.

Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002); accord

Alnwick v. European Micro Holdings, Inc., 281 F. Supp. 2d 629, 646 (E.D.N.Y. 2003)

(dismissing intentional fraudulent transfer claim that failed to identify the assets that were

transferred and identified the date of the transfer as "on or about 2001"); Wujin

Nanxiashu Secant Factory v. Ti-Well Int'l Corp., No. 01 Civ. 8871(JCF), 2002 WL

1144903, at *4 (S.D.N.Y. May 29, 2002)(dismissing intentional fraudulent transfer claim

that failed to identify the property that was transferred, when the transfers occurred and to

whom the transfers were made); see also FED. R. CIV. P. App. of Forms, Form 21 at ¶ 4.

Consequently, allegations that a debtor made an aggregate amount or series of cash or

other transfers over a period of time, without further particularization, are insufficient to

state an intentional fraudulent transfer claim.  E.g., Fed. Nat'l Mortgage Ass'n v.

---

[8] Rule 9(b) states:

(b) FRAUD OR MISTAKE; CONDITIONS OF MIND.  In alleging fraud or mistake, a party must state
with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other
conditions of a person's mind may be alleged generally.

Olympia Mortgage Corp., No. 04 CV 4971(NG)(MDG), 2006 WL 2802092, at *9
(E.D.N.Y. Sept. 28, 2006)(dismissing intentional fraudulent transfer claims that
aggregated and lumped a series of cash transfers made over a three to five year period
and failed to identify how many transfers were being challenged or the specific dates or
amounts of those transfers); Gindi v. Silvershein, No. 93 Civ. 8679(LLS), 1995 WL
347397, at *6 (S.D.N.Y. June 8, 1995)(dismissing intentional fraudulent transfer claim
that alleged a series of non-specific transfers and obligations); Silverman v. K.E.R.U.
Realty Corp. (In re Allou Distribs., Inc.), 379 B.R. 5, 31-32 (Bankr. E.D.N.Y.
2007)(dismissing claim of intentional fraudulent transfer of "millions of dollars" without
specifying the source, dates or the amounts of the transfers that the trustee was seeking to
recover); Thaler v. Adler (In re Adler), 372 B.R. 572, 581 (Bankr. E.D.N.Y.
2007)(dismissing intentional fraudulent transfer claim that did not "allege any specifics
as to the amounts or dates" of cash deposits made by a debtor husband into his wife's
bank account); cf. Sullivan v. Kodsi, 373 F. Supp. 2d 302, 306 (S.D.N.Y. 2005)(denying
motion to dismiss intentional fraudulent transfer claims challenging non-specific transfers
made to a family trust between late 1997 and June 2000 on the ground that the facts were
"peculiarly within the opposing party's knowledge," and several "badges of fraud" were
present).

The allegations of actual fraudulent transfer directed against the Pre-Petition
Banks fail to satisfy these requirements.  The Amended Complaint does not identify any
specific transfer, transferor,[9] transferee,[10] or date of transfer.  Instead, it challenges the

---

[9]    There are two debtors in the case, but the Amended Complaint frequently lumps them together.

"net" transfers in the amount of $175.3 million to the Fortgang Affiliates between January 2003 and the Petition Date.  Moreover, the focus on the aggregate "net" amount of transfers implies that some were repaid, undercutting the plaintiff's apparent theory that all of the Pre-Petition Bank loans were fraudulently reconveyed to the Fortgang Affiliates.  (See ¶ 32)("Fabrikant funded the transfers to the Fortgang Affiliates through these obligations that it incurred from the Pre-Petition Banks.")

The allegations regarding the single SPM transfer are free of most of these pleading deficiencies, but not all of them.  MFS purchased $32 million of gold from SPM on July 7, 2006, and both debtors were liable for the purchase price.  (¶ 37.)  Some $22 million worth of the gold purchased had already been delivered to the Fortgang Affiliates. (¶ 38.)  The Amended Complaint nevertheless fails to identify which Fortgang Affiliates were the transferees or the dates of the transfers.[11]  Hence, the claim against SPM also fails to satisfy Rule 9(b).  In light of this conclusion, it is unnecessary to reach the other arguments raised by the defendants in support of their motions to dismiss this element of the plaintiff's collapsing claim.[12]

---

[10]    The Fortgang Affiliates include 47 separate entities.  The Amended Complaint lumps them together, without distinction, in Counts I through IV.

[11]    According to the Amended Complaint, the SPM merchandise was delivered to the Fortgang Affiliates prior to the actual sale, and presumably on consignment.

[12]    The Court nevertheless rejects the argument, made at some length by certain defendants, that the plaintiff's claim is really one for aiding and abetting a breach of fiduciary duty which the plaintiff has failed to plead adequately, and in any event, lacks standing to assert.  The plaintiff is not asserting any such claim.

### b.      Constructive Fraud

The plaintiff may also satisfy its pleading burden by alleging that the reconveyance of the loan proceeds and gold was constructively fraudulent under state or federal bankruptcy law.  Under the New York Debtor & Creditor Law ("NYDCL"), which the parties cite, a person challenging a transfer of the debtor's property as constructively fraudulent must show that it was made without fair consideration and (1) the debtor was insolvent or was rendered insolvent by the transfer, NYDCL § 273, (2) the debtor was left with unreasonably small capital, id., § 274, [13] or (3) the debtor intended or believed that it would incur debts beyond its ability to pay when the debts matured.  Id., § 275.  Sharp Int'l, 403 F.3d at 53.  Under NYDCL § 272,

> Fair consideration is given for property, or obligation,
>
> a.   When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, [14] or
>
> b.   When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

---

[13]      By its terms, § 274 ("unreasonably small capital") applies to conveyances but not obligations, and cannot be relied on to invalidate the debtors' loan debt or guaranties to the Pre-Petition Banks.  See Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest. Inc.), 337 B.R. 495, 508 (Bankr. S.D.N.Y. 2006).  Furthermore, the delivery of collateral to secure a non-avoidable debt or obligation constitutes a transfer supported by "fair consideration" that cannot be set aside under the NYDCL.  See id. at 502.

[14]      The "good faith" aspect of "fair consideration" is an "elusive concept" that "is hard to locate . . . in a statute in which the issue of intent is irrelevant."  Sharp Int'l, 403 F.3d at 54 (internal quotation marks and citation omitted).  Here, the Amended Complaint essentially alleges that Charles and Matthew Fortgang siphoned money and property from the debtors, who they controlled, and transferred the siphoned assets to the Fortgang Affiliates, who they also controlled.  Lack of good faith would presumably exist where the transferors and transferees are affiliates engaged in the sort of scheme alleged in the Amended Complaint.  The Amended Complaint also alleges that MFS was using some of the Pre-Petition Bank debt to repay debts owed to the Fortgang Affiliates while its own financial condition was deteriorating.  (¶ 41.)  Insider preferences by an insolvent transferor, even when made to satisfy valid debts, lack good faith.  See Sharp Int'l, 403 F.3d at 54.

The bankruptcy law contains similar provisions.  Under § 548(a)(1)(B), the

trustee must demonstrate that within two years of the petition date, (1) the debtor

transferred an interest in property; (2) the debtor was (a) insolvent at the time of the

transfer or became insolvent as a result of the transfer, (b) was engaged in business or

was about to engage in business for which the debtor's remaining property was an

unreasonably small capital, or (c) intended to incur or believed that it would incur debts

beyond its ability to pay as they matured, and (3) the debtor received less than a

reasonably equivalent value in exchange for such transfer.  "Good faith" is not an

element of the plaintiff's proof of "reasonably equivalent value" under the Bankruptcy

Code and the Uniform Fraudulent Transfer Act, see UNIF. FRAUDULENT TRANSFER ACT,

§ 4 cmt. 2 (2006); instead, good faith is an affirmative defense that the transferee may

raise but the plaintiff need not plead.  Silverman v. Actrade Capital, Inc. (In re Actrade

Fin. Techs. Ltd.), 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005).

Rule 9(b) does not apply to claims sounding in constructive fraudulent transfer,

Id. at 801 (collecting cases), and allegations of a constructive fraudulent transfer are

subject to less rigorous pleading requirements.  The plaintiff need not provide specific

facts to support its allegations, see Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007), and

Rule 8(a) only requires that the allegations "give the defendant fair notice of what the

plaintiff's claim is and the grounds upon which it rests."  Swierkiewicz v. Sorema N.A.,

534 U.S. 506, 512 (2002)(quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  As a

result, some of the same courts that rejected the non-particularized allegations of

intentional fraudulent transfers upheld the sufficiency of the constructive fraudulent

transfer claims based on the same allegations.  E.g., Fed. Nat'l Mortgage Ass'n, 2006 WL

2802092, at *9 (allegations that aggregated and lumped a series of transfers made over a three to five year period and failed to identify the number of transfers, the specific dates of the transfers or the amounts of the transfers "are sufficient to satisfy the notice pleading standard of Rule 8, but, [with one exception], not the heightened pleading standard of Rule 9(b)."); Gindi, 1995 WL 347397, at *5-6 (allegations that the debtor made or incurred a non-particularized series of transfers and obligations were sufficient to survive a motion to dismiss under Rule 12(b)(6) but insufficient under Rule 9(b)); see Court-Appointed Receiver for Lancer Mgmt. Group LLC v. 169838 Canada, Inc., No. 05-60235-CIV., 2008 WL 2262063, at *3 (S.D. Fla. May 30, 2008)(Rule 8(a) does not require the pleader to "allege the particular transfers which each of the [defendants] received," or the capacity in which the defendants received them); Sullivan, 373 F. Supp. 2d at 307-08 (denying motion to dismiss constructive fraudulent transfer claims challenging non-particularized transfers made to a family trust between late 1997 and June 2000).

Here, the Amended Complaint alleges that the debtors transferred over $175 million to the Fortgang Affiliates during a period lasting nearly four years. The Amended Complaint also includes the general allegations of insolvency (as well as the other financial tests), which are sufficient under Federal Civil Rule 8. See Danning v. Lavine, 572 F.2d 1386, 1388-89 (9th Cir. 1978) (Kennedy, J.); Pereira v. Cogan, No. 00 Civ. 619(RWS), 2001 WL 243537, at *8 (S.D.N.Y. Mar. 8, 2001). Finally, the Amended Complaint alleges that debtors did not receive reasonably equivalent value or fair consideration from the Fortgang Affiliates. The allegation is based on the contention that loan receivables generated by certain of the Affiliate Transfers, exceeding $50 million,

could not have been repaid, and degraded over time.  (¶ 25.)  In addition, the JPMC

Report,[15] discussed in more detail below, excluded all affiliate receivables in calculating

MFS' borrowing base.  According to the plaintiff, this implied that they "could not be

valued at face."  (¶ 43.)

The factual allegations in the Amended Complaint provide the Pre-Petition Banks

and SPM with clear notice of what the plaintiff intends to prove on the first prong; the

debtors reconveyed the Pre-Petition Bank loans and SPM gold to the Fortgang Affiliates

in exchange for worthless or near-worthless receivables at a time when they were or

became insolvent or unable to continue their businesses.  I cannot conclude that the

constructive fraudulent transfer claims are implausible, as pleaded, or that the plaintiff

should be foreclosed from offering evidence that the debtors failed to receive reasonably

equivalent value or fair consideration.  Accordingly, the Amended Complaint sufficiently

alleges that the debtors received transfers from the Pre-Petition Banks and SPM, or

incurred obligations based on those transfers, and reconveyed the transferred property to

the Fortgang Affiliates at a time when the debtors were or became insolvent (or met one

of the other financial tests) for less than reasonably equivalent value or fair consideration.

### 2.      The Second Prong

The plaintiff must also plead that the defendants (other than Sovereign Bank) had

actual or constructive knowledge of the debtors' scheme to make the constructive

fraudulent transfers to the Fortgang Affiliates.  Although Rule 9(b) allows the pleader to

allege knowledge generally, conclusory statements are insufficient.  Instead, the

---

[15] The JPMC Report is attached as Exhibit A to the Reply Declaration of Steven J. Mandelsberg in Further
Support of Defendants' Motions to Dismiss Complaint, dated March 4, 2008, ("JPMC Report") (ECF Doc.
# 49).

complaint must allege some specific facts that support an inference of knowledge.

Devaney v. Chester, 813 F.2d 566, 568-69 (2d Cir. 1987); Elemary v. Holzmann, A.G.,

533 F. Supp. 2d 116, 132 (D. D.C. 2008); see Sunbeam, 284 B.R. at 372-73.  Thus, while

conclusory allegations of insolvency or inadequate consideration may suffice for the

purpose of alleging the elements of a constructive fraudulent transfer claim (under the

first prong), they are not sufficient to support an allegation that the Pre-Petition Banks

and SPM knew that the transfers were fraudulent.  Instead, the plaintiff must plead the

minimal facts necessary to present a plausible claim that the Pre-Petition Banks and SPM

knew or should have known of the Fortgangs' scheme.

According to the plaintiff, the defendants (other than Sovereign Bank) had

knowledge as early as January 2003, of  "the existence of the Fortgang Affiliates, of the

fact that the Fortgang Affiliates were not owned by MFS, of MFS's practice of funding

those Fortgang Affiliates, of the fact that a substantial portion, if not virtually all, of the

funding the Pre-Petition Banks would advance to MFS in the future would be transferred

to Fortgang Affiliates and of MFS's deteriorating financial condition from January 2001

to the Petition Date."  (¶ 42; see also Opposition Memo at 42.)  The defendants (other

than Sovereign Bank) also "had knowledge that any consideration MFS would receive

from the Fortgang Affiliates would be of little or no value to MFS."  (¶ 43.)

The principal factual support for the allegations regarding knowledge comes from

the JPMC Report.  In 2002, JPMC commissioned the report to assist it in deciding

whether to extend an unsecured credit facility to MFS in the sum of $51,500,000.  (JPMC

Report at 1577.)[16]  The JPMC Report indicated that MFS conducted an ongoing jewelry business, at least prior to October 2002, which included significant business transactions with the Fortgang Affiliates.  MFS primarily purchased its inventory overseas, typically from affiliates,[17] (Id. at 1579, 1592), but substantial credits traveled in both directions. As of October 31, 2002, MFS owed accounts payable in the sum of $130,383,947 to the affiliates, and the affiliates owed MFS accounts receivable of $67,971,893, i.e., MFS owed the affiliates the net amount of $62,412,054.  (Id. at 1669.)  In addition, the affiliates owed MFS $50,059,335 on account of intercompany loans, and MFS owed its affiliates $18,868,370, also on account of intercompany loans. (Id. at 1672.)

As noted, the affiliate receivables were ignored for the purpose of computing the borrowing base.  The JPMC Report showed that MFS still had $159,320,457 in eligible receivables, $152 million in bank debt, and over $7,320,457 in excess availability.  (Id. at 1628.)  Furthermore, this did not take into account MFS' total inventory of $203,483,000. (Id.)  In short, the JPMC Report revealed an entity with plenty of unencumbered liquid assets.

Consequently, the JPMC Report did not provide the minimal factual basis to support a plausible argument that the Pre-Petition Banks and SPM knew or should have known of the Fortgangs' alleged scheme to make constructive fraudulent transfers to the Fortgang Affiliates.  First, the Amended Complaint alleges, partly on information and

---

[16]     The citation to page numbers in the JPMC Report refers to the Bates-stamped page numbers. Each page is stamped with a consecutive, five digit number that begins with "0."  The initial "0" has been omitted from the citation.

[17]     There is a near complete overlap between the MFS affiliates referred to in the JPMC Report, (see JPMC Report at 1644, 1669), and the Fortgang Affiliates listed on Exhibit A to the Amended Complaint.

belief, that the Pre-Petition Banks received the report, (¶ 43), but does not allege that SPM ever saw it.

Second, it does not support the conclusory statement that the Pre-Petition Banks knew that MFS did not "own" the Fortgang Affiliates. To the contrary, the JPMC Report referred to them as "affiliates," suggesting the opposite conclusion. Furthermore, transfers to third parties, particularly affiliates, are supported by fair consideration when the debtor benefits indirectly. Indirect benefits may include synergy, increased access to capital, safeguarding a source of supply and protecting customer relationships. Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 578-79 (7th Cir. 1998); Nirvana Rest., 337 B.R. at 502.

The JPMC Report indicated, in this regard, that MFS and the affiliates made intercompany transfers in furtherance of their respective businesses, and depended on each other to conduct their respective businesses. MFS depended on the Fortgang Affiliates to provide most of its inventory, and relied on their credit to obtain it – MFS owed far more to the Fortgang Affiliates than they owed to MFS. If anything, the JPMC Report implied that MFS used the Pre-Petition Bank loans to fund legitimate business transactions with the Fortgang Affiliates. Although the JPMC Report also showed net loans to affiliates aggregating over $30 million, the purchase and sale transactions, and the corresponding accounts payable and receivable, dwarfed the amount of the loans. Under the circumstances, knowledge that affiliated entities engaged in the same business and bought and sold each other's products undercuts an inference of knowledge, actual or constructive, that the transfers between them were part of a fraudulent scheme.

Third, the JPMC Report does not support the allegation that the Pre-Petition

Banks knew or should have known that MFS' financial condition was deteriorating, or

more to the point, that the transfers to the Fortgang Affiliates rendered MFS insolvent or

unable to continue in business.  MFS had substantial liquid assets, in the form of

receivables and inventory, which exceeded its bank debt by a significant margin.  MFS

continued to operate for another four years before filing a chapter 11 petition.  Most

significantly, the Pre-Petition Banks continued to make unsecured loans to MFS for

approximately two years after they allegedly saw the JPMC Report.[18]  Their lending

activities were inconsistent with the actual or constructive knowledge that the Fortgangs

were siphoning MFS' assets and transferring them to the Fortgang Affiliates for no

consideration, and rendering the debtors insolvent or unable to continue in business in the

process.

Apparently sensing some skepticism on the reader's part that the Pre-Petition

Banks would knowingly making uncollectible loans, the Amended Complaint offered a

variety of reasons why the Pre-Petition Banks made the loans anyway.  According to ¶

45, they did so out of a "desire to be recognized as the premier lenders to the international

jewelry and diamond industry," "their belief that it was not possible to maintain their

reputation as leading lenders to that industry unless they were lenders to MFS" and

because "Charles and Matthew Fortgang would not allow MFS to do business with them

if they attempted to restrict transfers to Fortgang Affiliates."  Furthermore, they believed

---

[18]      The Amended Complaint alleges that the Pre-Petition Banks secured their loans in October 2004.
While this may support an inference that they perceived an increased risk of collection, it does not support
an inference that they knew or should have known that MFS was insolvent or on the verge of becoming
insolvent—the Pre-Petition Banks continued to make loans.  Furthermore, the Amended Complaint does
not provide any facts relating to MFS' financial condition in October 2004, or the Pre-Petition Banks'
knowledge of that condition.

that they were protected from the adverse consequences of the risky loans through "the
personal guaranties of Matthew and Charles Fortgang and, subsequently, by obtaining
liens on all of the assets of MFS and FLI."   Five of the Pre-Petition Banks were also
creditors of the Fortgang Affiliates, and, benefited directly from the Affiliate Transfers.

These allegations amount to no more than an effort to bolster an implausible
theory with rank speculation.  No facts are offered to support the inference that any
particular Pre-Petition Bank was so concerned about its lender reputation in the jewelry
business, or what the Fortgangs thought about it, that it would make the types of loans
necessary to fund the scheme alleged in the Amended Complaint.  Furthermore, the
Amended Complaint does not plead any facts to support the contention that the Pre-
Petition Banks were willing to make risky loans based on the Fortgangs' guarantees or
liens on unidentified assets.  Indeed, if the Fortgang Affiliate receivables were truly
worthless, this would imply that the Fortgang Affiliates were insolvent, and could not pay
their debts.  In that event, the Fortgangs' equity in the insolvent Fortgang Affiliates
would be worthless, and their ability to honor their guarantees would be more doubtful.
Finally, the fact that five unidentified Pre-Petition Banks were also creditors of the
Fortgang Affiliates and benefited from the Affiliate Transfers implies that these banks
made new loans simply to repay the old loans.

In conclusion, the Amended Complaint does not set forth a plausible claim that
the Pre-Petition Banks or SPM knew or should have known that the debtors were
engaged in a multi-year scheme to make constructive fraudulent transfers of the Pre-
Petition Bank loans and the SPM gold to the Fortgang Affiliates.  Accordingly, the
corresponding obligations to the Pre-Petition Banks are not avoidable, FLI's guarantee of

those obligations is not voidable, and Counts I through III must be dismissed.[19]  In

addition, since the obligations are not avoidable, the liens given to secure the obligations

are supported by antecedent debts, and cannot be avoided.  Consequently, Count IV must

also be dismissed.

**B.    Counts V through VII**

**1.    The Sufficiency of the Allegations**

The last three Counts do not depend on the collapsing doctrine, or, at least in the

first instance, the defendant banks' knowledge.  Counts V and VI allege that between

January 2006 and the Petition Date, the debtors transferred the aggregate amount of

$38,890,000 to four specific Fortgang Affiliates: Alpha Diamond, Diamfab, Fabrikant

Trading India and Fabrikant HK.  During the same period, the four Fortgang Affiliates

transferred $14,025,784 to HSBC, $8,364,295 to ABN and $5,946,592 to IDB.  In

addition, between January 2005 and the Petition Date, the debtors transferred

$10,535,000 to VSI, another Fortgang Affiliate, and during the same time span, VSI

transferred $9,882,351 to Sovereign Bank in satisfaction of its own debt.  The Fortgang

Affiliates made the second set of transfers to pay down their own obligations to the

transferee defendant banks.  The plaintiff contends that the first set of transfers, from the

debtors to the Fortgang Affiliates, were actually or constructively fraudulent.  It seeks to

avoid these first transfers, and in Count VII, recover the value of the transfers from the

---

[19]    The Amended Complaint does not supply any information about the FLI obligations that MFS
guaranteed.  Hence, it does not state a claim that the FLI independent obligations were fraudulent, or that
MFS' guarantee of those obligations was fraudulent.

subsequent transferees, HSBC, ABN, IDB and Sovereign Bank (collectively, the "Defendant Banks"). [20]

The initial transfers appear to be a subset of the transfers that were indirectly challenged in Counts I through III.  In any case, the allegations relating to the intentional fraudulent transfer claims are insufficient for the reasons stated, plus a few more.  The Amended Complaint fails to identify the date or amount of each transfer.  Instead, it aggregates an indefinite number of transfers made during a 2-3 year period.  Furthermore, except in the case of VSI, the Amended Complaint does not identify which Fortgang Affiliate received a particular transfer.  Instead, it lumps the transfers and the transferees together.

The pleading is similarly vague in alleging the second set of transfers to the Defendant Banks.  The Amended Complaint does not specify the dates or amounts of the transfers.  Except for VSI, it also fails to identify which of the other four Fortgang Affiliates made a particular transfer, and who among the Defendant Banks received that transfer.  Instead, it lumps the transfers, the transferors and transferees together.  Accordingly, claims that the initial transfers were made with actual fraudulent intent fail, and the plaintiff cannot recover those transfers from a subsequent transferee.

Conversely, the allegations regarding constructive fraudulent transfers are sufficient, again for the reasons stated.  The Court has already addressed the allegations of constructive fraudulent transfers from the debtors to the Fortgang Affiliates.  These are

---

[20]     Under 11 U.S.C. § 550(b)(1), the trustee cannot recover from a subsequent transferee who took the transfer for value, in good faith and without knowledge of the avoidability of the initial transfer.  These are affirmative defenses that the transferee defendant must plead and prove.  Cassirer v. Sterling Nat'l Bank & Trust Co. of N.Y. (In re Schick), 223 B.R. 661, 664-65 (Bankr. S.D.N.Y. 1998).

sufficient to state a claim for avoidance. The Amended Complaint also alleges that the

four Fortgang Affiliates retransferred the initial transfers to the four Defendant Banks.

The allegations provide the Defendant Banks with notice of the plaintiff's claims, and

permit them to defend the action. Accordingly, the claims to recover the constructive

fraudulent transfers from the Defendant Banks, as subsequent transferees, are legally

sufficient.

### 2. The Failure to Join The Fortgang Affiliates

Although Counts V through VII seek to avoid the transfers by the debtors to the

five Fortgang Affiliates, the plaintiff did not join these or any Fortgang Affiliates as

defendants. The Court raised the question and invited briefing on whether the § 550(a)

action could proceed in their absence. This is a variation of a frequently asked and often

debated point: can a trustee recover under § 550(a) from a subsequent transferee without

first avoiding the transfer in a suit against the initial transferee. I conclude that under the

circumstances alleged in the Amended Complaint, the plaintiff can bypass the Fortgang

Affiliates and proceed directly against the Defendant Banks.

### a. The Bankruptcy Code

The Bankruptcy Code separates the concepts of avoidance and recovery. Levit v.

Ingersoll Rand Fin. Corp. (In re VN Deprizio Constr. Co.), 874 F.2d 1186, 1196 (7th Cir.

1989); Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.), 307 B.R. 744,

749 (Bankr. S.D.N.Y. 2004); HR Rep No. 95-595 at 375 (1977)("[S]ection 550

prescribes the liability of a transferee of an avoided transfer, and enunciates the

separation between the concepts of avoiding a transfer and recovering from the

transferee."); S Rep No. 95-989 at 90 (1978)(same). Several sections permit a trustee to

avoid a transfer on the ground that it is fraudulent.  <u>See, e.g.</u>, 11 U.S.C. §§ 544(b), 548.

Sometimes, this is all the relief the trustee needs.  For example, if a trustee challenges the

granting of a mortgage, and the court avoids the mortgage as a fraudulent transfer, the

declaration of voidness ends the litigation – the trustee does not need to "recover" the

mortgage.

More often, however, the trustee will seek affirmative recovery beyond a judicial

declaration of voidness.  For example, if the debtor fraudulently transferred a piece of

personal property, the trustee will seek to avoid the transfer <u>and</u> recover the personal

property or its value.  Similarly, if the debtor fraudulently transferred cash and the trustee

avoids the transfer, he will want to recover the same amount of cash.

Section 550 deals with the situations involving affirmative recovery.  Section

550(a) states:

> Except as otherwise provided in this section, <u>to the extent that a
> transfer is avoided</u> under section 544, 545, 547, 548, 549, 553(b), or
> 724(a) of this title, the trustee may recover, for the benefit of the estate,
> the property transferred, or, if the court so orders, the value of such
> property, from . . . the initial transferee of such transfer or the entity for
> whose benefit such transfer was made; or any immediate or mediate
> transferee of such initial transferee.

(emphasis added).  As noted, the debate generated by the emphasized language is whether the

trustee must first avoid a transfer as between the initial transferor and transferee, before he can

recover from the subsequent transferee.

The starting point for the construction of any statute is the plain language of the statute

itself.  <u>United States v. Ron Pair Enters.</u>, 489 U.S. 235, 242 (1989)("The plain meaning of

legislation should be conclusive, except in the 'rare cases [in which] the literal application of a

statute will produce a result demonstrably at odds with the intentions of its drafters.'")(internal

citation omitted).  The meaning of "to the extent avoided" is apparent.  "Avoid" is a verb that

means "[t]o render void, BLACK'S LAW DICTIONARY 146 (8th ed. 2004)("BLACK"), or "to annul,

vacate, defeat, evade, invalidate."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY

(UNABRIDGED) 151 (1981).  It is not synonymous with "avoidable."  Avoidable, or "voidable,"

is an adjective.  It describes a transaction that can be voided, id. at 2562, but that is "[v]alid until

annulled."  BLACK 1605.  In other words, a transfer must be avoidable in order to be avoided, but

until it is avoided, it is as valid as an unavoidable transfer.

A significant number have cases have read § 550 to require that the plaintiff must

first (or simultaneously) bring a successful suit against the initial transferee before he can

recover the transfer or its value from the subsequent transferee.[21]  E.g., Weinman v.

Simons (In re Slack-Horner Foundries Co.), 971 F.2d 577, 580 (10th Cir. 1992)("[I]n

order to recover from a subsequent transferee the trustee must first have the transfer of

the debtor's interest to the initial transferee avoided under § 548"); Allou Distribs., 379

B.R. at 19 ("Thus, before the Trustee may obtain an 'actual recovery' from the Movants

under § 550(a), he must first avoid the underlying initial transfers."); Geltzer v. Fur

Warehouse, Ltd. (In re Furs by Albert & Marc Kaufman, Inc.), Adv. Proc. No. 05-1838,

2006 WL 3735621, at *8 (Bankr. S.D.N.Y. Dec. 14, 2006)(noting that an "essential

element" of a trustee's recovery under § 550(a) was his avoidance of the initial transfer);

Williams v. Mortillaro (In re Res., Recycling & Remediation, Inc.), 314 B.R. 62, 69

(Bankr. W.D. Pa. 2004)("Section 550(a) is a recovery provision and gives rise to a

---

[21]     Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.), 343 B.R. 75 (Bankr. S.D.N.Y. 2006), which is
frequently cited in support of this proposition, has been reversed.  See Order Reversing and Remanding
Judgment of the Bankruptcy Court, dated Apr. 16, 2008, Adv. Proc. No. 03-93370 (ECF Doc. # 167).

secondary cause of action which applies after the trustee has prevailed under one (or more) of the avoidance provisions found in the Bankruptcy Code."); Yoppolo v. Liberty Mortgage (In re Morgan), 276 B.R. 785, 789 (Bankr. N.D. Ohio 2001)(the statutory language of § 550 and its legislative history leads to the conclusion that a trustee must first avoid an underlying transfer before recovery); Greenwald v. Latham & Watkins (In re Trans-End Tech., Inc.), 230 B.R. 101, 104-05 (Bankr. N.D. Ohio 1998)(under the plain and unambiguous language of § 550(a), a prerequisite to recovery from any transferee is that the initial transfer first be avoided rather than merely proven to be avoidable); Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.), 195 B.R. 971, 981-82 (Bankr. D. Mass. 1996)("If the initial transferee makes a second transfer, the property may be recovered from the later transferee only if the 'transfer is avoided' with respect to the 'initial transferee.'"); Santee v. Nw. Nat'l Bank (In re Mako, Inc.), 127 B.R. 471, 473 (Bankr. E.D. Okla. 1991)(a cause of action under § 550(a) may be brought only after a trustee prevails pursuant to the transfer avoidance sections of the Code).

An equally significant number of cases have reached the opposite result, concluding that the trustee can sue the subsequent transferee in the first instance, and need prove only that the initial transfer was avoidable. E.g., IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.), 408 F.3d 689, 706 (11th Cir. 2005)("[O]nce the plaintiff proves that an avoidable transfer exists he can then skip over the initial transferee and recover from those next in line."); Kendall v. Sorani (In re Richmond Produce Co., Inc.), 195 B.R. 455, 463 (N.D. Cal. 1996)("[O]nce the trustee proves that a transfer is avoidable under section 548, he may seek to recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is made."); Brown v. Phillips (In re Phillips), 379

B.R. 765, 780 (Bankr. N.D. Ill. 2007)("A court must first make a determination whether the transfer was fraudulent under applicable state law and, therefore, avoidable under § 544(b) before that transfer can be recovered pursuant to § 550(a)."); Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co., Inc.), 371 B.R. 589, 638 (Bankr. D.N.H. 2007)(In a recovery action under § 550, it is "sufficient if the complaint asserts that there are avoidable transfers under state or federal law . . . ."); Leonard v. Optimal Payments Ltd. (In re Nat'l Audit Def. Network), 332 B.R. 896, 915 (Bankr. D. Nev. 2005)(adopting the holding of International Administrative Services); Crafts Plus+, Inc. v. Foothill Capital Corp. (In re Crafts Plus+, Inc.), 220 B.R. 331, 338 (Bankr. W.D. Tex 1998)("Once it has been established that a qualified transfer has been made, § 550 provides for recovery against either the initial transferee . . . or 'the entity for whose benefit such transfer was made.'"); see Erickson v. Leonard (In re AVI, Inc.), 389 B.R. 721, 735 (B.A.P. 9th Cir. 2008)("[W]e hold that a trustee is not required to avoid the initial transfer from the initial transferee before seeking recovery from subsequent transferees under § 550(a)(2)."). In Richmond Produce, District Judge Schwarzer explained that § 550 does not contain language suggesting that recovery from a subsequent transferee is dependent on a prior action or recovery against the initial transferee. The introductory "to the extent that" language in § 550(a) recognizes that transfers are sometimes avoided only in part, and only the avoidable part is recoverable. 195 B.R. at 463; accord Int'l Admin. Servs., Inc., 408 F.3d at 706. International Administrative Services also expressed the concern that an initial transferee could escape liability by retransferring the property. 408 F.3d at 704.

Although § 550 plainly limits recovery to the extent that the transfer is actually avoided, it does not follow that the "avoidable" courts reached the wrong result. The cases that read "to the extent avoided" literally assume that the initial transferee must be a party to the avoidance action. See Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC), 340 B.R. 829, 839 (Bankr. E.D. Mich. 2006). The decisions on both sides of the issue have focused on the language of the Bankruptcy Code because the parties directed their attention to that provision. However, the Bankruptcy Code, and specifically §§ 544(b) and 548, does not identify the proper, necessary or indispensable parties to a fraudulent transfer action, and does not state that the initial transferee is necessary. Instead, we must look to the Federal Rules of Civil Procedure.

### 2.    FED. R. CIV. P. 19

Federal Civil Rule 19, made applicable to this adversary proceeding by Federal Bankruptcy Rule 7019, governs the required joinder of parties.[22]  The Rule establishes a

---

[22]    Rule 19 provides:

**(a) PERSONS REQUIRED TO BE JOINED IF FEASIBLE.**

(1) Required Party.  A person who is subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

. . . .

 **(b) WHEN JOINDER IS NOT FEASIBLE.**  If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

three-part test to determine whether joinder of a party is required: (1) is the absent party a "necessary" party, 4 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 19.02[3][a], at 19-17 (3d ed. 2008)("MOORE"); (2) is the absent party's joinder "feasible," id. § 19.02[3][b], at 19-17 to -18, and (3) if joinder is not feasible, should the court, in "equity and good conscience," dismiss the action because the nonparty is "indispensable" under Rule 19(b)?  Id. § 19.02[3][c], at 19-19; see Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 124 (1968); Viacom Int'l, Inc. v. Kearney, 212 F.3d 721, 725 (2d Cir. 2000); Associated Dry Goods Corp. v. Towers Fin. Corp., 920 F.2d 1121, 1123 (2d Cir. 1990).

The Fortgang Affiliates are not necessary parties under Rule 19(a)(1)(A).  "A Rule 19(a)(1) inquiry is limited to whether the district court can grant complete relief to the persons already parties to the action.  The effect a decision may have on the absent party is not material."  Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 405 (3d Cir. 1993); accord Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York, 762 F.2d 205, 209 (2d Cir. 1985); Drankwater v. Miller, 830 F. Supp. 188, 192 (S.D.N.Y. 1993).  Here, the plaintiff can obtain complete relief by recovering a money judgment against the Defendant Banks without regard to the Fortgang Affiliates.

---

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

    (A) protective provisions in the judgment;

    (B) shaping the relief; or

    (C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

In addition, Rule 19(a)(1)(B) does not require the Fortgang Affiliates' joinder. Rule 19(a)(1)(B)(i) focuses on the prejudice to the absent party if the litigation proceeds in its absence. The absentee must "claim a legally protected interest relating to the subject matter of the action," Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 (9th Cir. 1983), and the impact of any adjudication must be "direct and immediate." Janney Montgomery Scott,, 11 F.3d at 407. "[I]f the outcome of the litigation will have no practical effect on the absentee's interest, the absentee is not a necessary party." 4 MOORE § 19.03[3][b], at 19-49. The mere possibility of collateral estoppel is not enough; "[r]ather, it must be shown that some outcome of the federal case that is reasonably likely can preclude the absent party with respect to an issue material to the absent party's rights or duties under standard principles governing the effect of prior judgments." Janney Montgomery Scott., 11 F.3d at 409.

A transferee that retains title to or an interest in the property conveyed is a necessary party to the fraudulent transfer action, Valvanis v. Milgroom, 529 F. Supp. 2d 1190, 1199-1200 (D. Haw. 2007); Nastro v. D'Onofrio, 263 F. Supp. 2d 446, 450 (D. Conn. 2003); Tanaka v. Nagata, 868 P.2d 450, 454 (Haw. 1994), because the fraudulent transfer action will affect the transferee's title or interest. See Tanaka, 868 P.2d at 455 ("Fundamental principles of due process require that transferees who claim an interest in real property or its proceeds have a full and fair opportunity to contest claims of fraudulent transfer."). Conversely, an earlier transferee who has parted with all interest in the transferred property is not necessary in a suit against a subsequent transferee. Tsiatsios v. Tsiatsios, 744 A.2d 75, 80 (N.H. 1999)("[W]e agree with the majority of jurisdictions that have held that a transferor who has parted with all interest in the

property can no longer be affected by any decree pertaining to the property, and that therefore the transferor is not a necessary party to a fraudulent transfer action."); 37 AM. JUR. 2d, <u>Fraudulent Conveyances and Transfers</u> § 188 (Westlaw Database updated Sept. 2008)("A grantee who has parted with possession of the property is a necessary party in some jurisdictions, but it is more frequently the case that he no longer has any interest in the subject matter and therefore is not a necessary party.")(footnotes omitted); 37 C.J.S., <u>Fraudulent Conveyances</u> § 254 (Westlaw Database updated June 2008)("As a general rule, an intermediate grantee through whom the title to the property passes from the debtor to the ultimate grantee, and whose title and interest in the property has been divested, is not a necessary, although he or she may be a proper, party . . . ."); <u>see generally</u> W.J. Dunn, <u>Necessary Parties Defendant To Action To Set Aside Conveyance In Fraud Of Creditors</u>, 24 A.L.R.2d 395 (1952).

The Defendant Banks do not contend that Alpha Diamond, Diamfab, Fabrikant Trading India, Fabrikant HK or VSI retained an interest in the funds they transferred to the Defendant Banks. Instead, they contend that certain Fortgang Affiliates, who they do not identify, filed claims in these cases. The Defendant Banks then state, without citation to legal authority, that "[i]f the transfers in Claims Five through Seven are avoided, any claims against the debtor-transferors held by Fortgang Affiliates that are transferees of those transfers would be subject to disallowance under Bankruptcy Code § 502(d)." (<u>Memorandum Of Law Of HSBC Bank USA, National Association, ABN Amro Bank N.V., Israel Discount Bank Of New York, And Sovereign Precious Metals, LLC In Further Support Of Motion To Dismiss Complaint</u>, dated Mar. 21, 2008, at 6)(ECF Doc. # 50).)

The Defendant Banks failed to show that the Fortgang Affiliates implicated in the last three claims filed claims in this case. The Defendant Banks also failed to explain why they would be bound by a determination avoiding the initial transfers, and could not litigate that issue in a claim objection proceeding. Hence, there is no basis to conclude that the five Fortgang Affiliates will be prejudiced if this action proceeds in their absence.

Finally, the Fortgang Affiliates are not necessary under Rule 19(1)(B)(ii), which focuses on whether an existing party – here, the four Defendant Banks – will be subjected "to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." The "multiple liability" clause is intended to protect the defendant against inconsistent obligations, not inconsistent adjudications. See 4 MOORE § 19.03[4][b], [4][d] at 19-59 to -60. Thus, for example, where the plaintiff sues one of two tortfeasors, the defendant does not face "multiple liability" because it may lose in the original action and then lose the subsequent action for contribution against the other joint tortfeasor. See Janney Montgomery Scott, 11 F.3d at 411; 4 MOORE § 19.03[4][e], at 19-63 to 64. The Defendant Banks have not highlighted any inconsistent liability that they might have to face if they lose to the plaintiff.

Accordingly, the Court concludes that the Fortgang Affiliates are not necessary or "required" parties, and it is unnecessary to consider the feasibility of their joinder, or their indispensability.[23] The plaintiff can proceed directly against the Defendant Banks, and

---

[23]    Although not argued by the Defendant Banks, some courts have expressed a concern that if the trustee did not have to avoid the initial transfer, § 550(f)(1) would become meaningless. With certain exceptions, a trustee must bring an action to avoid a fraudulent transfer within two years of the order for relief. 11 U.S.C. § 546(a)(1). Section 550(f) provides that a recovery action must be brought no later than one year after the avoidance of the transfer or the closing or dismissal, whichever occurs first. This suggests that without the judgment of avoidance, the period of limitations under § 550(f) would never start

"avoid" the initial transfer as to them.  In fact, even if the plaintiff had successfully

avoided the transfer by the debtors to the Fortgang Affiliates in an earlier action, the

Defendant Banks could still defend against Counts V through VII on the basis that the

initial transfers were not fraudulent.  See Leshin v. Welt (In re Warmus), 276 B.R. 688,

694-95 (S.D. Fla. 2002)(subsequent transferee not collaterally estopped from contesting

avoidability following settlement between trustee and initial transferee); Thompson v.

Jonovich (In re Food & Fibre Prot., Ltd.), 168 B.R. 408, 416 (Bankr. D.

Ariz.1994)(trustee who obtained a default judgment against the initial transferee was

required to prove every element of preference or fraudulent transfer against the

subsequent transferee); see VFB L.L.C. v. Money's Trust (In re VF Brands, Inc.), 282

B.R. 134, 139 (Bankr. D. Del. 2002)(denying motion for stay pending appeal on the

ground, inter alia, that the movant, a subsequent transferee, would not be collaterally

estopped from contesting any issue decided in the action between the trustee and the

initial transferee).  In other words, the trustee must always "avoid" the transfer as against

the subsequent transferee unless collateral estoppel or res judicata applies.  Moreover,

this conclusion allows a trustee to settle with the initial transferee and pursue the

subsequent transferees, or pursue a subsequent transferee when he is unable to sue the

initial transferee.

---

to run. E.g., Trans-End Tech., 230 B.R. at 104 ("If the Court were to adopt the Trustee's argument of
avoidability, the limitation periods of both § 546 and § 550(f) would be rendered meaningless.").

No such danger exists. Section 546(a) imposes a statute of limitations that applies to all avoidance
lawsuits. If the trustee sues a subsequent transferee to avoid a transfer, as the plaintiff did here, he must do
so within the period of limitations prescribed in § 546(a). If the trustee seeks to recover the transfer or its
value under § 550 in the same suit, he necessarily satisfies § 550. AVI, Inc., 389 B.R. at 734. If, for some
reason, he seeks only to avoid the transfer, and is successful, he must then bring the § 550(a) action against
that same defendant within the time period prescribed in § 550(f). Id.

## C.        Leave To Amend

If the Amended Complaint must be dismissed, the plaintiff asks for leave to amend.  Generally, leave to amend should be freely granted when justice so requires unless it would be futile.  Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995); see Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002)("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.")(quoting Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993)).  The decision is committed to the trial court's discretion.  Id.

Two pleading deficiencies led to the dismissal of various parts of the Amended Complaint.  First, the plaintiff failed to particularize the transfers that it contends were made with actual fraudulent intent.  Second, it failed to plead the facts necessary to support the inference that the Pre-Petition Banks or SPM had actual or constructive knowledge of the Fortgangs' fraudulent scheme.  The plaintiff may be able to cure these pleading deficiencies, and accordingly, its motion for leave to amend the Amended Complaint will be granted.

In conclusion, Counts I through IV are dismissed in their entirety, and the portions of Counts V through VII that assert intentional fraudulent transfer claims are

also dismissed.  The plaintiff is granted leave to replead within thirty days of this decision

and order.

So ordered.

Dated: New York, New York
October 10, 2008

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge

.