UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------X
In re:                                             :
                                                   :    Chapter 11 (Confirmed)
          M. FABRIKANT & SONS, INC., et al.,       :    Case No. 06-12737 (SMB)
                                                   :    Jointly Administered
                              Debtors.             :
-----------------------------------------------------------------X
BUCHWALD CAPITAL ADVISORS LLC,                     :
as Trustee of the MFS GUC Trust,                   :
                                                   :
                              Plaintiff,           :
                 -- against --                     :    Adv. Proc. No.: 07-02780
                                                   :    and 08-01734
JP MORGAN CHASE BANK, N.A., ABN AMRO :
BANK N.V., BANK OF AMERICA, N.A., HSBC :
BANK USA, NATIONAL ASSOCIATION, BANK:
LEUMI USA, ISRAEL DISCOUNT BANK OF :
NEW YORK, ANTWERPSE DIAMANTBANK,                   :
N.V., ANTWERPSE UNITED DIAMANT, N.V., :
SOVEREIGN PRECIOUS METALS, LLC,                    :
and SOVEREIGN BANK,                                :
                                                   :
                              Defendants.          :
-----------------------------------------------------------------X
```

## MEMORANDUM DECISION AND ORDER GRANTING
## IN PART AND DENYING IN PART MOTION TO DISMISS
## THE SECOND AMENDED COMPLAINT

**A P P E A R A N C E S:**

SUSMAN GODFREY LLP
Attorneys for Plaintiff
654 Madison Avenue
New York, New York 10065

     Arun Subramanian, Esq.
     Stephen D. Susman, Esq.
     Jacob W. Buchdahl, Esq.
     Jonathan J. Ross, Esq.
     Robert Rivera, Jr., Esq.
        Of Counsel

HAHN & HESSEN LLP
Attorneys for Defendant JP Morgan Chase Bank, N.A.
488 Madison Avenue
New York, New York 10022

    Steven J. Mandelsberg, Esq.
        Of Counsel


CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for Defendant ABN Amro Bank N.V.
One World Financial Center
New York, New York 10281

    Gregory M. Petrick, Esq.
    Ingrid Bagby, Esq.
        Of Counsel


REIMER & BRAUNSTEIN LLP
Attorneys for Defendant Bank of America, N.A.
Three Center Plaza, 6th Floor
Boston, Massachusetts 02108

    Paul S. Samson, Esq.
        Of Counsel


PHILLIPS LYTLE LLP
Attorneys for Defendant HSBC Bank USA
437 Madison Avenue, 34th Floor
New York, New York 10022

    William J. Brown, Esq.
        Of Counsel


CULLEN AND DYKMAN LLP
Attorneys for Defendant Antwerpse Diamantbank, N.V.
100 Quentin Roosevelt Boulevard
Garden City, New York 11530

    Matthew G. Roseman, Esq.
        Of Counsel


MILBANK, TWEED, HADLEY & McCLOY LLP
Attorneys for Defendants Sovereign Precious Metals, LLC and Sovereign Bank
1 Chase Manhattan Plaza
New York, New York 10005

    Douglas W. Henkin, Esq.
        Of Counsel

HERRICK, FEINSTEIN LLP
Attorneys for Defendant Bank Leumi USA
2 Park Avenue
New York, New York 10016

> Andrew C. Gold, Esq.
> Frederick E. Schmidt, Esq.
>      Of Counsel

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Attorneys for Defendant Israel Discount Bank of New York
30 Rockefeller Plaza
New York, New York 10112

> Elizabeth M. Rotenberg-Schwartz, Esq.
> Russell L. Reid, Esq.
>      Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

This lawsuit arose out of the bankruptcy of M. Fabrikant & Sons, Inc. ("MFS")

and Fabrikant-Leer International, Ltd. ("FLI," and collectively with MFS, "Fabrikant" or

the "debtors").  In its Second Amended Complaint ("SAC"), dated Dec. 5, 2008 (ECF

Doc. # 63),[1] the General Unsecured Creditors Trust ("GUC Trust" or "Plaintiff") asserts

a variety of claims to avoid certain obligations and transfers, and to recover the value of

the liens securing the obligations or the property transferred.  The Defendants jointly

moved to dismiss the SAC.  They also moved to dismiss a separate complaint that asserts

preference claims and disallowance claims under 11 U.S.C. § 502(d).  For the reasons

that follow, the motion is granted in part and denied in part.  The Plaintiff's request for

leave to replead is also granted in part and denied in part.

---

[1]      Unless otherwise noted, the ECF Doc. #s refer to entries in Adv. Proc. No. 07-2780.

## BACKGROUND [2]

The debtors are corporations organized under New York law. (¶¶ 13-14.) MFS has been in the diamond and jewelry business since 1895, and for many years, was one of the largest and most prominent diamond and jewelry wholesalers in the world. (¶ 27.) Charles Fortgang and Matthew Fortgang own approximately 32% of the stock of MFS. (¶ 28.) At all relevant times, Charles and Matthew Fortgang served, respectively, as the chairman and president of the debtors, and controlled both debtors. (¶ 28; see ¶ 29.) The remainder of MFS's stock is owned through a trust by Marjorie Fortgang and Susan Fortgang and by employees or former employees of MFS. (¶ 28.) Finally, MFS owns 82% of the stock of FLI. (Id.)

Charles and Matthew Fortgang, and trusts of which Charles, Matthew and Susan Fortgang were beneficiaries, own a group of 47 companies engaged in the diamond and jewelry business (the "Fortgang Affiliates"). (¶ 30.) With few exceptions, neither debtor had any ownership interest in any of the Fortgang Affiliates. (Id.) The Fortgang Affiliates are listed on Exhibit A to the SAC.

MFS became insolvent no later than January 2003, (¶ 31), and FLI became insolvent no later than January 13, 2006. (¶ 32.) The debtors filed their chapter 11 petitions on November 17, 2006 (the "Petition Date"), and the cases have been jointly administered.

---

[2]    The "Background" discussion is derived from the SAC. The parenthetical notation "(¶ _)" refers to paragraphs in the SAC.

**A.      The "Scheme" Transactions (Counts I through IV)**

**1.      The Debtors and the Lending Banks**

For many years prior to the Petition Date, the debtors borrowed money from J.P. Morgan Chase Bank, N.A. ("JPMC"), ABN AMRO Bank N.V. ("ABN"), Bank of America ("BOA"), HSBC Bank USA, N.A. ("HSBC"), Bank Leumi USA ("BL"), Israel Discount Bank of New York ("IDB"), Antwerpse Diamantbank, N.V. ("ADB," and collectively, the "Lending Banks").  (See ¶¶ 53, 115.)  Between January 2003 and the Petition Date, and while insolvent, the debtors incurred the following aggregate obligations to the Lending Banks:

| Lending Bank | Amount ($) |
|---|---|
| JPMC | 35,838,000 |
| ABN | 44,290,000 |
| BOA | 10,475,000 |
| HSBC | 12,075,000 |
| BL | 11,592,000 |
| IDB | 9,660,000 |
| ADB | 5,454,000 |
| **Total** | **129,384,000** |

(¶ 115.)

At the same time that the Lending Banks were making loans to the debtors, the debtors were transferring funds to the Fortgang Affiliates.  Pursuant to an arrangement with the Lending Banks, MFS made large transfers to the Fortgang Affiliates each

December to allow the Fortgang Affiliates to "clean up" their loans, and those Fortgang Affiliates transferred funds back to MFS every January to enable MFS to "clean up" its own loans to the Banks. (¶¶ 33-35.) Between January 1, 2003 and the Petition Date, MFS transferred almost $67 million more to the Fortgang Affiliates than it received in return. (¶ 39.) During the same period, FLI transferred $1,422,445.10 more to the Fortgang Affiliates than it received in return. (¶ 41.) The funds transferred to the Fortgang Affiliates were derived from the proceeds of the loans made by the Lending Banks to the debtors. (¶¶ 44, 48-49.) The debtors did not receive reasonably equivalent value in exchange for their transfers to the Fortgang Affiliates, and the transfers were not made in good faith. (¶¶ 40, 42; see ¶ 47.)

In October 2004, it became evident that the debtors would not be able to satisfy their yearly "clean up." (¶ 109.) To further protect themselves, the Lending Banks demanded and obtained security interests in all of the debtors' assets as collateral for their previously unsecured debts. (Id.) On January 13, 2006, MFS guaranteed the $8.5 million debt that FLI owed to defendants ABN and BL. (¶ 54.) That same day, FLI guaranteed $92 million of existing obligations owed by MFS to the Lending Banks, thereby incurring all of MFS's pre-existing obligations to the Banks during the two-year period prior to the Petition Date. (¶¶ 32, 55.) FLI did not receive reasonably equivalent value in exchange for its guaranty. (¶¶ 32, 56.)

## 2.      The Debtors and SPM

Separately, on July 7, 2006, the debtors each became jointly and severally obligated to SPM for $32 million on account of MFS's purchase of gold from SPM. (¶

58.)  By this date, at least $22 million worth of gold had been delivered to certain

Fortgang Affiliates, and the purchase was made for their benefit.  (¶ 59.)

### 3.    The Fraudulent Nature of the Scheme

The transfers by the debtors to the Fortgang Affiliates described above, in the net

amount of at least $90 million, (see ¶ 62), were made with actual and constructive

fraudulent intent as evidenced by the following facts:  (i) the senior officers of the debtors

were owners of the Fortgang Affiliates (¶ 63), (ii) the value of the consideration received

in exchange for the transfers to the Fortgang Affiliates was not reasonably equivalent to

the value of the transfers (¶¶ 61, 63),  (iii) the debtors were in a distressed financial

condition at the time of the transfers (¶ 63), and (iv) MFS transferred massive sums to the

Fortgang Affiliates immediately after drawing down on its bank lines of credit.  (¶ 50; see

SAC, Exs. B1 and B2.)

The Lending Banks and SPM made the loans or extended the credit to fund the

transfers to the Fortgang Affiliates in disregard of actual or constructive knowledge of the

facts that rendered those transfers fraudulent.  (¶ 64.)  Specifically, they knew that (i) the

Fortgang Affiliates were not owned by MFS, (ii) MFS engaged in the practice of funding

the Fortgang Affiliates, (iii) a substantial portion of the funding which the Banks

advanced to MFS was thereafter transferred to Fortgang Affiliates, and (iv) MFS's

financial condition was deteriorating from January 2001 to the Petition Date.  (Id.)

### B.    The Subsequent Transfers (Counts V through VII)

Counts V and VI of the SAC allege that between January 2006 and the Petition

Date, the debtors made actual or constructively fraudulent transfers in the aggregate

amount of $38,890,000 to several Fortgang Affiliates -- Alpha Diamond Co., Inc.,

Diamfab PVBA, Fabrikant Trading India, and Fabrikant HK Trading Ltd.-- and the

Fortgang Affiliates used those proceeds to repay their own debts to defendants HSBC,

ABN, and IDB in the following amounts:

| Bank | Amount ($) |
|------|-----------|
| ABN | 8,364,265 |
| HSBC | 14,025,784 |
| IDB | 5,946,592 |
| **Total** | **28,336,641** |

(¶¶ 106, 137-144.)

In addition, from January 2005 until the Petition Date, the debtors made actual or

constructive fraudulent transfers in the total amount of $10,535,000 to another Fortgang

Affiliate, VSI, LLC ("VSI").  (¶¶ 139, 147.)  VSI paid $9,882,351 from these funds to

defendant Sovereign Bank ("Sovereign") in satisfaction of VSI's own debt.  (¶¶ 140,

148.)  Counts V and VI seek to avoid the initial transfers from the debtors to the Fortgang

Affiliates, and through Count VII, the Plaintiff seeks to recover the value of those

transfers from the transferee banks.

## C.    The Preferential Payments (Count VIII)

Count VIII seeks to avoid and recover the following preferential transfers made

by the debtors to various defendants within 90 days of the Petition Date:

| Defendant | Amount ($) |
|---|---|
| ABN | 7,695,943 |
| ADB | 397,933 |
| Antwerpse United Diamant, N.V. ("Antwerpse United") | 70,480 |
| BOA | 2,064,495 |
| BL | 644,195 |
| HSBC | 696,112 |
| IDB | 563,186 |
| JPMC | 7,732,672 |
| Sovereign | 1,346,022 |
| SPM | 754,974 |
| **Total** | **21,966,013** |

(¶ 160.)[3]  The SAC alleges that these transfers were made on account of antecedent debts, while the debtor was insolvent, and the transfers enabled these defendants to receive more than they would have received in a hypothetical chapter 7 case if the transfers had not been made, and instead, the defendants received payment of their claims under chapter 7 of the Bankruptcy Code.  (See ¶¶ 160-66.)

---

[3]        The SAC alleges these transfers with specificity.

**D.      The Post-Petition Bankruptcy Sale**

As of the Petition Date, the Lending Banks and SPM held alleged secured claims

against the debtors in the sum of $161.3 million.  (¶ 112.)  The debtors acknowledged

these claims in the <u>Final Order Authorizing Debtors' Use of Cash Collateral and Granting</u>

<u>Adequate Protection Claims and Liens</u>, dated Dec. 18, 2006 (the "FCCO")(Case No. 06-

12737, ECF Doc. # 93), subject to Committee's right to object.  (¶ 112.)  After the

Petition Date, the Lending Banks and SPM sold their secured claims for an amount

believed to be in excess of 50% of the amount of their claims.  (<u>Id.</u>)  On May 21, 2007,

all of MFS' remaining assets were sold at an auction.  (¶ 113.)  Wilmington Trust

Company, the agent for the purchasers of the secured debt, purchased the majority of the

assets for $38.5 million.  (<u>Id.</u>)  Surya Capital purchased the remaining assets for $10.4

million.  (<u>Id.</u>)  The sale proceeds, added to over $35 million transferred post-petition to

the Lending Banks and SPM, establishes that the value of their collateral was no less than

$80 million.  (<u>Id.</u>)

**E.      This Adversary Proceeding**

**1.      The Amended Complaint and First Motion to Dismiss**

The Plaintiff's predecessor, the Official Committee of Unsecured Creditors

("Committee"), commenced this adversary proceeding on October 1, 2007 (<u>see</u> ECF Doc.

# 1), and subsequently filed an amended complaint.  (<u>Amended Complaint</u>, dated Mar.

27, 2008 ("<u>Amended Complaint</u>"))(ECF Doc. # 54.)  The Amended Complaint included

seven claims for relief.  Like the SAC, Counts I through IV alleged, in substance, that the

Lending Banks and SPM had made loans to the debtors knowing that the debtors would

thereafter fraudulently transfer the proceeds or goods purchased with the loans to the

Fortgang Affiliates.  The Committee sought to avoid the obligations to these defendants, and recover the value of the liens given to them by the debtors.  Similarly, Counts V through VII sought to avoid transfers by the debtors to certain Fortgang Affiliates that, in turn, were allegedly transferred to ABN, IDB, HSBC and Sovereign to pay down the Affiliates' obligations to these defendants, and to recover the value of the transfers from the transferee defendants.

Each Defendant moved to dismiss the Amended Complaint, and the motions were granted in part and denied in part.  See Official Committee of Unsecured Creditors v. JP Morgan Chase, N. A. (In re M. Fabrikant & Sons, Inc.), 394 B.R. 721 (Bankr. S.D.N.Y. 2008)("Prior Decision").  The Court dismissed Counts I through IV, noting two main deficiencies.  First, the claims of actual fraudulent transfer did not satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Prior Decision, 394 B.R. at 734.  Second, although the Amended Complaint adequately pleaded claims sounding in constructive fraudulent transfer, it did "not set forth a plausible claim that the Pre-Petition Banks or SPM knew or should have known that the debtors were engaged in a multi-year scheme to make constructive fraudulent transfers of the Pre-Petition Bank loans and the SPM gold to the Fortgang Affiliates."  Id. at 739.  Similarly, the Court dismissed the claims based on actual fraudulent transfers in Counts V and VI for failure to satisfy Rule 9(b), but denied the motion to dismiss the constructive fraudulent transfer claims.  Id. at 740.  The Court granted the Committee leave to amend.  Id. at 746-47.

### 2.    The SAC[4]

The Plaintiff filed the "corrected" SAC on December 5, 2008.  The SAC is

divided into four parts and contains the following nine counts:

| Count | Defendant | Description of Claim(s) |
|---|---|---|
| 1 | Lending Banks and SPM | Avoiding the obligations incurred by both debtors in the amounts of $44,290,000 to ABN, $12,075,000 to HSBC, $9,660,000 to IDB, $5,454,000 to ADB, $11,592,000 to BL, $10,475,000 to BoA, $35,838,000 to JPMC, and $32,000,000 to SPM under Bankruptcy Code § 544.  (¶¶ 115-21.) |
| 2 | Lending Banks and SPM | Avoiding the obligations incurred by FLI in the amounts of $44,290,000 to ABN, $12,075,000 to HSBC, $9,660,000 to IDB, $5,454,000 to ADB, $11,592,000 to BL, $10,475,000 to BoA, $35,838,000 to JPMC, and $32,000,000 to SPM under Bankruptcy Code § 548.  (¶¶ 122-26.) |
| 3 | Lending Banks and SPM | Avoiding the obligations incurred by MFS in the amounts of $16,790,000 to ABN, $2,075,000 to HSBC, $9,660,000 to IDB, $1,521,628 to ADB, $4,592,000 to BL, $5,075,000 to BoA, $22,338,000 to JPMC, and $32,000,000 to SPM under Bankruptcy Code § 548.  (¶¶ 127-31.) |
| 4 | Lending Banks and SPM | Avoiding of the liens securing the fraudulent obligations alleged in Counts I through III, and recovering the value of the collateral received by the defendants from the debtors under Bankruptcy Code § 550.  (¶¶ 132-36.) |
| 5 | ABN, IDB, HSBC, & Sovereign | Avoiding the transfers made by the debtors of $14,025,784 to HSBC, $8,364,265 to ABN, $5,946,592 to IDB and $9,882,351 to Sovereign under Bankruptcy Code § 544.  (¶¶ 137-44.) |
| 6 | ABN, IDB, HSBC, & Sovereign | Avoiding, under § 548, the transfers made by the debtors in the amounts of $14,025,784 to HSBC, $8,364,265 to ABN, $5,946,592 to IDB and $9,882,351 to Sovereign under Bankruptcy Code § 548.  (¶¶ 145-53.) |

---

[4]    Prior to filing the SAC, the plaintiff filed a separate adversary proceeding on November 17, 2008 asserting the preference and § 502(d) claims that mirror Counts VIII and IX (the "Preference Complaint"). The two adversary proceedings have been consolidated for pre-trial purposes.

| 7 | ABN, IDB, HSBC, & Sovereign | Recovering the value of the payments made by the Fortgang Affiliates to defendants ABN, IDB, HSBC and Sovereign under Bankruptcy Code § 550.  (¶¶ 154-59.) |
| 8 | All Defendants | Recovering preferential transfers in the amount of $7,695,943 to ABN, $397,933 to ADB, $70,480 to Antwerpse United Diamant, $2,064,495 to BoA, $644,195 to BL, $696,112 to HSBC, $563,186 to IDB, $7,732,672 to JPMC, $1,346,022 to Sovereign, and $754,974 to SPM under Bankruptcy Code § 547. (¶¶ 160-68.) |
| 9 | All Defendants | Disallowance of Claims under Bankruptcy Code § 502 (d).  (¶ 171.) |

### 3.      The Motion to Dismiss

The Defendants moved to dismiss on various grounds.  They contend that the SAC continues to fall short of the pleading requirements for claims sounding in both actual and constructive fraud.  (Memorandum of Law in Support of Defendants' Motion to Dismiss, dated Jan. 20, 2009, at 7-27)(ECF Doc. # 71.)  Counts VIII and IX assert unauthorized claims, (id. at 28), but in any event, the Plaintiff lacks standing to assert these claims and they are also barred by the statute of limitations.[5]  (Id. at 28-33.)  Finally, Count II, which is based on the FLI guaranty, must be dismissed as a result of the substantive consolidation of the debtors under the Plan.  (Id. at 34-37.)  The moving memorandum includes some arguments made by certain specific defendants, (id. at 38-50), but for the most part, these fall into one of the general categories just mentioned.

---

[5]      The defendants also contend that the Plaintiff lacks standing to assert the claims in the Preference Complaint.

## DISCUSSION

**A.    Count VIII**

Count VIII asserts preference claims against each of the defendants.  These claims were originally raised in the Preference Complaint, and subsequently reasserted in the SAC.  The defendants have moved to dismiss the preference claims in both pleadings, citing two fatal flaws:  the Plaintiff lacks standing to assert the claims, and moreover, they are barred by the applicable statutes of limitation.

"[S]tanding, . . . in both its constitutional and prudential dimensions, is a prerequisite to federal subject matter jurisdiction." Wight v. BankAmerica Corp.**,** 219 F.3d 79, 89 (2d Cir. 2000); accord Allocco Recycling, Ltd. v. Doherty**,** 378 F. Supp. 2d 348, 356 (S.D.N.Y. 2005).  Thus, the assertion of a lack of standing is the equivalent of a motion to dismiss for lack of subject matter jurisdiction.  Where a party moves to dismiss for lack of subject matter jurisdiction, a court must accept the material factual allegations in the complaint as true, but unlike a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, need not draw inferences favorable to the plaintiff.  J.S. v. Attica Cent. Schools, 386 F.3d 107, 110 (2d Cir. 2004), cert. denied, 544 U.S. 968 (2005); Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).  A court may also consider materials outside of the pleadings to resolve any jurisdictional disputes, but cannot rely on conclusory or hearsay evidence.  J.S., 386 F.3d at 110; Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000); see 2 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE, § 12.30[3], at 12-42 (3d ed. rev. 2009)("[T]he court need not confine its evaluation to the face of the pleadings,

but may review or accept any evidence, such as affidavits, or it may hold an evidentiary

hearing.").

### 1.    The Final Cash Collateral Order ("FCCO")

The challenge to the Plaintiff's standing begins with a discussion of the FCCO.

As of the Petition Date, the debtors owed the Lending Banks, Sovereign and SPM

(collectively, the "FCCO Lenders")[6] roughly $162 Million.  (FCCO, at p. 6.)  Under the

FCCO, the FCCO Lenders agreed to allow the debtors to use their cash collateral, and the

debtors agreed to provide adequate protection.  As an additional inducement to obtain the

FCCO Lenders' consent to the use of their cash collateral, the debtors acknowledged the

extent and validity of the FCCO Lenders' claims and liens, agreed not to seek to avoid or

challenge them, and released and waived all claims against the FCCO Lenders.  (Id. at ¶

21.)  It is undisputed that the debtors' acknowledgment, release and waiver covered the

avoidance claims at issue in this litigation.

In exchange for the debtors' acknowledgment, release and waiver, the FCCO

granted the Committee a limited period to commence an adversary proceeding against the

FCCO Lenders for the purpose, inter alia, of challenging their pre-petition claims or liens,

avoiding or challenging "any transfer made by or on behalf of the Debtors to or for the

benefit of [the FCCO Lenders] prior to the Petition Date," or seeking damages or

equitable relief against the FCCO Lenders arising from or related to their pre-petition

business relationship with the debtors (collectively defined in the FCCO as a

"Challenge").  (Id. at ¶ 22.)  The FCCO also conferred standing on the Committee to

---

[6]        The FCCO did not cover Antwerpse United.

commence the Challenge without further order of the Court.  (<u>Id.</u>)  If the Committee

failed to act within the limited period, "[t]he Committee shall be barred forever from

commencing a Challenge."  (<u>Id.</u>)

The parties agree that the Committee's Challenge period, which was extended

beyond the original 120 day period, expired on October 1, 2007.  On that day, the

Committee commenced this adversary proceeding, and on March 27, 2008, filed an

Amended Complaint that joined Sovereign as a defendant.  The Prior Decision addressed

the legal sufficiency of the allegations in the Amended Complaint.  Neither the original

Complaint nor the Amended Complaint asserted any preference claims or claim

objections under 11 U.S.C. § 502(d).

### 2.    The Plan

On May 12, 2008, the Court signed an order confirming the <u>Joint Plan of

Liquidation Under Chapter 11 of the Bankruptcy Code of the Official Committee of

Unsecured Creditors, the Debtors' Current Lenders, Wilmington Trust Company, as

Agent to the Current Lenders, and the Debtors</u>, dated Nov. 7, 2007 (the "<u>Plan</u>")(Case No.

06-12737, ECF Doc. # 458).  The Plan created two entities to receive the estates' causes

of action – the Shared Asset Trust ("SAT") and the General Unsecured Creditor Trust, or

GUC Trust, the Plaintiff in this adversary proceeding.

The GUC Trust received the "Original Lenders Litigation Claims."  (<u>Id.</u> § 7.02.)

The "Original Lender Litigation Claims" referred to "Claims and Causes of Action of the

Debtors, the Estates, or the Committee against the <u>Original Lenders or their affiliates</u>

arising from their actions or failures to act prior to the Petition Date in connection with

the Debtors or the Non-Debtor Affiliates." (<u>Id.</u> § 1.01, at 10)(emphasis added.)  The

definition of "Original Lenders" included the Lending Banks and SPM, but did not

expressly include Sovereign or Antwerpse United.  (<u>Id.</u>)  Sovereign concedes, however,

that it is an affiliate of SPM, (Transcript of Hearing, held Feb. 26, 2009 ("Tr."), at 74-

75)(Case No. 06-12737, ECF Doc. # 976), and accordingly, the definition of "Original

Lender Litigation Claims" includes claims against Sovereign.  All other claims not

released under the Plan, including avoidance claims, vested in the SAT.  (<u>Plan</u>, § 7.02.)

     The definition of "Original Lender Litigation Claims" is arguably broad enough

on its face to encompass the preference claims alleged in the Preference Complaint and

Count VIII.  Nevertheless, the Plan, when viewed in its entirety, belies this interpretation.

Exhibit B to the Plan Supplement, dated Nov. 30, 2007, (Case No. 06-12737, ECF Doc. #

494), entitled "Schedule of Estate Causes of Action to be Transferred to Shared Asset

Trust" confirmed that the SAT would receive "[a]voidance claims, including, without

limitation, fraudulent conveyance and preference claims against all transferees (including

subsequent as well as initial transferees) of property of the Debtors and all entities in

whose favor obligations were incurred by the Debtors." (<u>Id.</u> at 1.)  The final paragraph

stated that the "parties against whom such claims may be asserted also include those

identified in schedules submitted by the Debtors in response to Questions 3A and 3B of

the Debtors' respective Statements of Financial Affairs, copies of which are annexed

hereto as Schedules 1 and 2." (<u>Id.</u> at 3.)

The attached Schedules listed the transfers made by each debtor within the 90 day period preceding the Petition Date.[7]   The Schedules included the same defendants and transfers incorporated in the Preference Complaint and Count VIII.  The <u>Order Confirming Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code</u>, dated May 12, 2008 (Case No. 06-12737, ECF Doc. # 652) confirmed the allocation of rights. (<u>Id.</u> at ¶ 22.)  In short, the Plan Supplement unambiguously assigned the preference claims to the SAT.

The Disclosure Statement, approved on November 7, 2007, (Case No. 06-12737, ECF Doc. # 458), bolsters this conclusion.  The Disclosure Statement included a section entitled "Original Lender Litigation Claims," (<u>see</u> <u>Disclosure Statement</u>, at § V.K, at 25), that referred to the claims asserted in the original Complaint under sections 544 and 548 of the Bankruptcy Code, but did not mention the preference claims.  That omission, coupled with the specific provisions of the Plan Supplement that expressly allocated the preference claims to the SAT, compels the conclusion that the preference claims were not included in the general definition of "Original Lender Litigation Claims."

This result is also consistent with the rule of contract interpretation that "specific terms and exact terms are given greater weight than general language."  <u>Aramony v. United Way of Am.</u>, 254 F.3d 403, 413 (2d Cir. 2001)(quoting RESTATEMENT (SECOND) OF CONTRACTS § 203(c) (1981)); <u>accord</u> <u>Muzak Corp. v. Hotel Taft Corp.</u>, 133 N.E.2d 688, 690 (N.Y. 1956)(Even if there was an inconsistency between a specific provision and a general provision of a contract . . ., the specific provision controls.").  Although this

---

[7]    The Schedules also listed the transfers to insiders within one year of the Petition Date, but these transfers are not relevant.

principle of construction is a "guide" and not a "rule requiring blind adherence," see

Aramony, 254 F.3d at 414 n.5, the specific terms of the Plan Supplement are susceptible

of only one reasonable interpretation.  Accordingly, the Plaintiff lacks standing to assert

the preference claims.

The Plaintiff maintains that even if the Plan gave the SAT the right to assert the

preference claims, the SAT abandoned that right to the Plaintiff.  Section 5.12 of the Plan

states that if the Shared Assets Beneficiary Committee abandons any claims included

among the Trust Assets, the GUC Trust has the option to pursue the abandoned claims at

its own expense.  The Shared Assets Trust Agreement provides that "the Shared Assets

Trustee shall obtain the approval of the Beneficiary Committee prior to taking any action

regarding . . .  abandonment . . .  and/or election not to pursue of any Cause of Action or

any other litigation by the Shared Assets Trust wherein the amount in controversy

exceeds $250,000."  (Shared Assets Trust Agreement, § 2.3(a).)[8]  Finally, Section 2.2 of

the Shared Assets Trust Agreement sets forth the procedures that the Beneficiary

Committee must follow in order to take action, including the abandonment of the

preference claims.

The SAC does not allege that the SAT abandoned the preference claims, and the

evidence submitted by the Plaintiff does not show that it did.  The proof is limited to an

email exchange between the attorneys for the SAT and the GUC Trust.  (See Declaration

of Arun S. Subramanian in Support of Plaintiff's Opposition to Defendants' Motion to

Dismiss, dated Feb. 23, 2009 ("Subramanian Declaration") (ECF Doc. # 77), Ex. C.)  The

---

[8]        An unexecuted copy of the Shared Assets Trust Agreement is included as Exhibit A to the Plan
Supplement.  (Case no. 06-12737, ECF Doc. # 469).

SAT's attorney, Philip Bentley, Esq., sent a November 12, 2008 email to Christopher Caruso, Esq., the GUC Trust's lawyer, questioning whether the GUC Trust intended to pursue the preference claims. (Id.) Bentley expressed the concern that time was getting short (the statute of limitations under 11 U.S.C. § 546(a) was due to expire five days later), and the SAT would have to scramble if the GUC Trust did not pursue them. (Id.) Caruso responded the same day that there was no need to scramble because the Plaintiff's lawyers in this adversary proceeding intended to pursue the preference claims on behalf of the GUC Trust. (Id.)

This exchange does not demonstrate that an abandonment had occurred. To the contrary, the SAT was still considering the possibility of asserting the claims, which it could not do if they had been abandoned at any time prior to the email exchange. Furthermore, there is no evidence that the Beneficiary Committee ever abandoned these claims in accordance with the procedures set forth in the Shared Assets Trust Agreement. Instead, the proof suggests that the lawyers decided who would bring the claims without regard to the formalities of abandonment.

### 3.    Antwerpse United

The Plaintiff lacks standing to assert the preference claims against Antwerpse United for an additional reason. The definition of "Original Lenders" did not mention Antwerpse United. (Plan, § 1.01.) However, the "Original Lender Litigation Claims" included claims against the unnamed affiliates of the named "Original Lenders." (Id.) The SAC alleges that Antwerpse United was an affiliate of ADB, a named "Original Lender," benefited from ADB's loans, "shared the lenders' knowledge, participated in those entities' bad acts, and [is] liable for fraudulent and preferential transfers as

described in Counts Five through Nine below." (¶ 1, at n. 1.)  ADB's counsel stated at

oral argument that "[t]here is no relationship between the new Antwerp entity and the

original lender." (Tr., at 53.)  Absent a concession from Antwerpse United, the

conclusory allegation of affiliation in the SAC footnote, without any factual allegation to

support the conclusion, is not entitled to any consideration.

Accordingly, the Plaintiff lacks standing to pursue the preference claims in Count

VIII and the Preference Complaint.  The Plaintiff may be able to plead a basis for

standing (e.g., abandonment), if given another chance, and accordingly, the Court will

grant the Plaintiff leave to replead Count VIII.

The preference claims asserted in the Preference Complaint are dismissed with

prejudice although this will not affect the Plaintiff's ability to replead Count VIII.  The

Preference Complaint was filed more than one year after the October 1, 2007 FCCO

statute of limitations had run.  There is no original pleading to which these claims can

relate back, see FED. R. CIV. P. 15(c)(1), and any amendment would be futile.  If the

Plaintiff is to allege legally sufficient preference claims, it must do so through an

amendment to Count VIII.[9]

---

[9]       While the Court does not decide the issue, it is difficult to imagine a set of facts that would render
transfers to the Lending Banks preferential.  The only such transfers that the Original and Amended
Complaints sought to recover in Count IV "were the liens and security interests and proceeds thereof"
received by the Lending Banks (and SPM) from the debtors.  If the Plaintiff avoids the obligations to the
Lending Banks, the transfers of "liens and security interests and proceeds thereof," while arguably
fraudulent, would not have been made for or on account of an antecedent debt.  See 11 U.S.C. § 547(b)(2).
Conversely, if the Plaintiff fails to avoid the obligations to the Lending Banks, the liens and security
interests will be valid, and the transfer of the proceeds of the collateral on account of the Lending Banks'
secured claims will not be preferential because of the operation of 11 U.S.C. § 547(b)(5).  See Savage &
Assocs., P.C. v. County of Fairfax, Virginia (In re Teligent Servs., Inc.), No. 06 Civ. 3721(KMW), 2009
WL 2152320, at * 4 (S.D.N.Y. July 17, 2009)("A general rule in preference actions, which derives from the
fifth element of the § 547(b) test, is that payments on account of secured debts are not preferential.")

**B.      Count IX**

Section 502(d) states, in substance, that the court shall disallow the claim of a

transferee of an avoidable transfer unless the transferee turns over the property or pays its

value.[10]  Section 502(d) does not provide for affirmative relief against the creditor.

Furthermore, it may be asserted as a basis to disallow a claim even after the statute of

limitations has run on the corresponding avoidance claim.  In re Asia Global Crossing,

Ltd., 344 B.R. 247, 251 (Bankr. S.D.N.Y. 2006).

The Ninth Claim for Relief alleges, upon information and belief, that the

defendants filed one or more proofs of claim or were scheduled as creditors, they

received voidable transfers, and their claims must, therefore, be disallowed.  (¶¶ 169-71.)

The Committee previously objected to claims filed by HSBC, ADB, IDB and ABN,

(Official Committee of Unsecured Creditors' Omnibus Objection to Certain Lender

Claims, dated Nov. 30, 2007)(Case No. 06-12737, ECF Doc. # 493), and the objection is

still pending.  The objection attached the original Complaint in this adversary proceeding,

and asserted, in substance, that the claims should be disallowed under § 502(d) because

those lenders had received the fraudulent transfers identified in the Complaint.  Count IX

now asserts the same claim against all of the Lending Banks, Sovereign and SPM.

The § 502(d) claim unquestionably arises out of the same transactions as the

claims asserted in the Complaint, and relates back to the filing of the original Complaint.

---

[10]      Section 502(d) provides:

(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any
claim of any entity from which property is recoverable under section 542, 543, 550, or
553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h),
544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid
the amount, or turned over any such property, for which such entity or transferee is liable
under section 522(i), 542, 543, 550, or 553 of this title.

See Fed. R. Civ. P. 15(c).[11]  The FCCO Lenders nevertheless contend that the Plaintiff is barred from asserting the § 502(d) objection because it raised the objection after October 1, 2007, and the "relation back" principle does not apply to the rights granted under the FCCO.

The FCCO does not support this interpretation.  Nothing in the FCCO suggests that it cut off the Committee's ability to amend a timely complaint to challenge the same transfers under a different theory.  Furthermore, the FCCO limited the Committee's standing to bring adversary proceedings, but § 502(d) does not require an adversary proceeding and can be raised through a claim objection.  Finally, § 502(d) states that the Court "shall disallow" the claim of any creditor that received an avoidable transfer and failed to repay it.  The claim disallowance is automatic if the estate representative prevails on the underlying avoidance claim.

Accordingly, the motion to dismiss Count IX is denied.  The § 502(d) claim asserted in the Preference Complaint duplicates Count IX, and does not provide the Plaintiff with any procedural or substantive advantages.  Consequently, it will be dismissed, thereby disposing of the Preference Complaint.

## C.    Substantive Consolidation

The defendants contend that Count II is based on the FLI guaranty, and the claim fails because the Plan substantively consolidated FLI and MFS.  The Plan did not expressly provide for substantive consolidation, and separately classified the creditors of

---

[11]    Rule 15(c)(1)(B) provides in pertinent part:

An amendment to a pleading relates back to the date of the original pleading when. . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading.

MFS and FLI, respectively, in Classes 4 and 5.  Nevertheless, the two classes received

identical treatment, and both were to be paid from a common fund consisting of the assets

of both debtors.  Under the circumstances, the plan effected a de facto substantive

consolidation.  See In re New Century TRS Holdings, Inc. 407 B.R. 576, 591-92 (D. Del.

2009)(aggregating multiple debtors to pay claims from a consolidated pool of assets

effects substantive consolidation).

The Plan's effect was not lost on the proponents.  They submitted the Declaration

of Michael A. O'Hara in Support of Confirmation of Joint Plan of Liquidation Under

Chapter 11 of the Bankruptcy Code, dated Dec. 17, 2007 (Case No. 06-12737, ECF Doc.

# 548), which included a detailed discussion of the elements of substantive consolidation.

(Id. at ¶¶ 26-47.)  Citing O'Hara's declaration, counsel for the proponents stated at the

confirmation hearing that the "two estates were being substantively consolidated."

(Transcript of Hearing, held Dec. 19, 2007, at 21)(Case No. 06-12737, ECF Doc. # 601.)

The de facto substantive consolidation of FLI and MFS defeats any claim to avoid

the FLI guaranty.[12]  See In re 599 Consumer Elecs., 195 B.R. 244, 246 (S.D.N.Y. 1996)

("[T]he consolidation of the estates of the companies that received the disputed payments

with the estates of the companies that made them generally defeats fraudulent

conveyance claims, because the merger of the two estates [leaves] no party unjustly

enriched and no creditors looking to an impoverished asset pool for payment.")(internal

quotation marks and citations omitted).  The creditors of FLI were not harmed by the

---

[12]    The defendants also argue that the substantive consolidation mooted any claims based on
intercompany loans between MFS and FLI.  That may be so, but none of the Plaintiff's claims appears to be
based on intercompany loans.

guaranty because the substantive consolidation under the Plan accomplished the same result, effectively rendering FLI liable for all of the debts owed to the MFS creditors, and vice versa.

In fact, Count I of the SAC implicitly recognizes the effect of substantive consolidation. It asserts the claim under 11 U.S.C. § 544 on behalf of "Fabrikant," which refers collectively to FLI and MFS, (¶ 115), and alleges that they incurred the obligations to the Lending Banks and SPM that provide the basis for their single damage claim under Count IV.[13] Similarly, Counts V and VI treat both debtors as one entity, alleging that certain defendant banks were the subsequent transferees of transfers made by "Fabrikant," and Count VII asserts a damage claim on behalf of "Fabrikant."

That said, it does not necessarily follow that Count II should be dismissed, at least on this basis. First, Count II does not expressly invoke the guaranty. Second, the same Court order that substantively consolidated the estates and nullified the harmful effect of the guaranty essentially rendered FLI liable for MFS's debts anyway. Thus, the circumstances of this case raise the question of whether substantive consolidation allows each of the debtors to challenge all of the transfers and obligations, regardless of which debtor made the transfer or incurred the obligation prior to their substantive consolidation. It may be appropriate to assert one claim for relief on behalf of

---

[13] In contrast, Counts II and III assert separate claims under 11 U.S.C. § 548, respectively, against FLI and MFS. There is no explanation for the inconsistent approach.

"Fabrikant" under 11 U.S.C. § 544(b), as in Count I, and one claim for relief on behalf of "Fabrikant" under 11 U.S.C. § 548.[14]

The Court need not decide this issue because Counts I through IV will be dismissed with leave to replead for the reasons discussed below. I therefore leave to the Plaintiff in the first instance the proper way to plead its claim.

**D.      The Motion to Dismiss Under Rules 12(b)(6) and 9(b).**

**1.      Introduction**

The Prior Decision discussed the standards governing a motion to dismiss under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. See Prior Decision, 394 B.R. at 730-36. After the Prior Decision was issued, the Supreme Court decided Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009). Amplifying its earlier opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 129 S. Ct. at 1949 (citations omitted). Iqbal outlined a two-step approach in deciding a motion to dismiss. Fowler v. U.P.M.C. Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("The Supreme Court's opinion in Iqbal extends the reach of Twombly [to civil cases] . . . . [and offers] a two-part analysis."). First, the court should begin by "identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of the truth." Iqbal, 129 S. Ct. at 1950. Threadbare recitals of the elements of a cause of action supported by conclusory

---

[14]      The dispute involving the guaranty claim has no practical consequence. The Plaintiff has standing to avoid the transfers and obligations made or incurred by each debtor, and if need be, can pursue them separately. In the end, it is entitled to only one satisfaction, and any recovery will be part of the common fund available on an equal basis to the unsecured creditors of both debtors.

statements are not factual.  See id.  Second, the court should give all "well-pleaded factual allegations" an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief.  Id.  Plausibility requires more than a "sheer possibility" of wrongdoing—the plaintiff must plead sufficient factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 1949.  Determining whether a claim is plausible, is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 1950.

### 2.   Counts I through IV

#### a.   The Lending Banks

Counts I through IV continue to rely on the "collapsing" theory discussed in the Prior Decision.  As explained there, the collapsing theory involves two prongs: (1) the consideration that Fabrikant received from the Lending Banks must have been retransferred fraudulently to the Fortgang Affiliates, and (2) the Lending Banks must have had actual or constructive knowledge of the entire scheme that that rendered the exchanges between Fabrikant and the Fortgang Affiliates fraudulent.  See Prior Decision, 394 B.R. at 731-32.

Exhibits B-1 and B-2 attached to the SAC span 157 pages and apparently detail every transfer from the Lending Banks to Fabrikant and from Fabrikant to the Fortgang Affiliates during the approximate four year period covered by the SAC.  By rough estimate, Exhibit B-1 identifies 5,600 transactions involving MFS and Exhibit B-2 lists another 500 or so transactions involving FLI.  The Exhibits do not lack for specificity.

They identify the date and amount of each transfer, as well as the identity of the transferor and transferee.

The specificity now present in the SAC illustrates the problems that were previously noted in the Amended Complaint. The $90 million in alleged fraudulent transfers by the debtors to the Fortgang Affiliates is a "net total amount." (¶ 62.) In other words, the $90 million reflects the difference between what the debtors transferred and what the Fortgang Affiliates repaid. This allegation makes no sense unless all of the transfers from the debtors to the Fortgang Affiliates were fraudulent. If a transfer was not fraudulent for any reason, e.g., if Fabrikant reconveyed a Lending Bank's funds to the Fortgang Affiliate for adequate consideration, the transfer should not be counted in computing the "net total amount," and furthermore, the transaction cannot be collapsed.[15] See HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995).

The documents that the Court may consider, including the JPMC Field Audit[16] and MFS's audited financial statements,[17] show the implausibility of the Plaintiff's underlying contention that all of the transfers from the debtors to the Fortgang Affiliates

---

[15]    The Plaintiff's net transfer theory sounds like a claim that the Fortgangs breached their fiduciary duties to the debtors through self-dealing, and the defendants aided and abetted the breach by providing the necessary funds. In that case, the net amount of unrepaid transfers might well represent the debtor's damages. The Plaintiff, however, lacks standing to assert breach of fiduciary duty claims against the Fortgangs, which were asserted by the SAT and ultimately settled. Moreover, the Plaintiff lacks standing under the Plan to assert aiding and abetting claims against the defendants, and probably also lacks standing to assert those claims under Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991).

[16]    The JPMC Field Audit is attached as Exhibit A to the Reply Declaration of Steven J. Mandelsberg in Further Support of Defendants' Motions to Dismiss Complaint, dated Mar. 4, 2008 ("JPMC Field Audit")(ECF Doc. # 49). The SAC referred to and relied on the JPMC Field Audit in ¶¶ 82 and 83.

[17]    The Appendix of Exhibits to the Joint Motion to Dismiss, dated January 20, 2009 (the "Appendix")(ECF Doc. #70), includes several sets of financial statements pertaining to Fabrikant covering the period from January 31, 2003 through January 31, 2006. (Id., Exs. J-P.) The SAC refers generally to Fabrikant's financial statements, and plaintiff's counsel agreed during oral argument that the Court could consider these Exhibits. (Tr. at 86-87.)

were fraudulent.  The parties made numerous transfers to each other in connection with

their respective businesses.  For example, the JPMC Field Audit, which was discussed in

the Court's earlier opinion, see Prior Decision, 394 B.R. at 738, documented the extent to

which MFS depended on the Fortgang Affiliates to provide most of its inventory, and

relied on their credit to obtain it; MFS owed far more to the Fortgang Affiliates than they

owed to MFS.[18]  If anything, the JPMC Field Audit implied that MFS used the proceeds

of the Lending Banks' loans, in large part, to fund legitimate business transactions with

the Fortgang Affiliates.

The audited financial statements confirmed that MFS purchased a substantial

amount of merchandise from the Fortgang Affiliates.  For the year ended July 31, 2003,

those purchases totaled $208,389,921.  (Appendix, Ex. K, at 8.)  Subsequent statements

did not list the amount of purchases, but each stated that "[a] significant portion of the

Company's purchases are from affiliated companies."  (Appendix, Ex. L, at 8; Ex. M, at

8; Ex. N, at 8; Ex. O, at 8; Ex. P, at 9.)

In this regard, the vast majority of transfers by Fabrikant to the Fortgang

Affiliates depicted on the SAC Exhibits B-1 and B-2 are for relatively small and odd-

numbered amounts.  For example, the first page of Exhibit B-1 includes transfers of

$28.27, $42.91, $60.80 and $73.20.  Others are for a few hundred or a few thousand

dollars.  The 157 pages comprising Exhibits B-1 and B-2 (with approximately 40

transfers per page) are replete with these types of entries, and the Court cannot "draw the

---

[18]      The Court previously remarked on the near overlap between the affiliates identified in the JPMC
Field Audit and the Fortgang Affiliates identified in Exhibit A to the Amended Complaint.  Prior Decision,
394 B.R. at 737 n.17.  An identical Exhibit A is attached to the SAC.

reasonable inference" that these transfers were fraudulent. Instead, common sense dictates that such transfers reflect payments on account of contemporaneous purchases or antecedent debts.[19]

In addition, the net transfer theory assumes that every promise by the Fortgang Affiliates to repay a transfer by the debtors was valueless simply because some of the transfers were never repaid. But a good receivable that turns bad does not turn a valid transaction into an avoidable transfer. The fraudulent nature of each transfer, including the value that the transferor received, must be determined at the time of the transfer without the benefit of hindsight. In re Hannover Corp., 310 F.3d 796, 802 (5th Cir. 2002) ("[C]onsistent with economic reality, this and other circuits unequivocally hold that for purposes of § 548 the value of an investment, even a risky one, such as we have before us now, is to be determined at the time of purchase."), cert. denied, 538 U.S. 1032 (2003); In re Fairchild Aircraft Corp., 6 F.3d 1119, 1126 (5th Cir. 1993)("[W]e cannot use hindsight to recalibrate the risk-or the potential reward-of Fairchild's [the debtor's] investment."); Cooper v. Ashley Commc'ns, Inc (In re Morris Commc'ns, NC, Inc.), 914 F.2d 458, 466 (4th Cir. 1990)("The critical time is when the transfer is 'made.' Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given."). The value of a receivable must, therefore, be determined at the time the promise to pay was made and not after a default.

---

[19]    The net transfer theory only makes sense when all of the transfers are presumptively fraudulent, as in the case of a Ponzi scheme. See Wing v. Horn, No. 2:09-cv-00342, 2009 WL 2843342, at *4 (D. Utah Aug. 28, 2009) ("[T]he Court draws on its common sense and experience in relying on the thoroughly plausible inference that the transfers made by the operator of a Ponzi scheme during the course of perpetuating that fraudulent activity are made with fraudulent intent.") This presumption allows the trustee of a bankrupt Ponzi scheme operator to "clawback" the net transfers made to the "winners." The SAC does not state or imply that Fabrikant was run as a Ponzi scheme.

<u>Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)</u>, Adv. No. 04-3841, 2007 WL
1308321, at * 8 (Bankr. S.D. Tex. May 3, 2007)("The fact that the Notes ultimately
proved to be of limited value does not affect the determination of value on the date of the
transfer.")

The SAC alleges that "[t]he value of these [Affiliate] receivables severely
degraded over time . . . ." (¶ 36.)  This implies that the Affiliate receivables had greater
value at the time they were acquired in exchange for the transfers.  Furthermore, the net
transfer theory necessarily implies that some, perhaps most, receivables were repaid by
the Fortgang Affiliates.  In short, it is implausible to argue that the debtors never received
reasonably equivalent value – measured at the time of each transfer – in exchange for
each transfer to a Fortgang Affiliate.

This conclusion does not, however, end the inquiry.  The Plaintiff does not have
to prove that every transfer by Fabrikant to the Fortgang Affiliates was fraudulent.  The
SAC identified nine sets of transactions – transfers by some of the Lending Banks to
Fabrikant followed by transfers by Fabrikant to the Fortgang Affiliates – that, at first
blush, arguably fit within the collapsing paradigm.  (¶ 50.)  There may be others, but the
Court is not inclined to undertake the burden of hunting through 157 pages and over
6,000 transactions to guess at the few that might, if alleged separately, survive a motion
to dismiss.  The preferable course is to dismiss the SAC, and give the Plaintiff the
opportunity to identify the alleged fraudulent transfers that support its collapsing theory.

Furthermore, the alternative of denying the motion would open up expensive and
time-consuming discovery, and might have the <u>in terrorem</u> effect of forcing the Lending

Banks to settle without regard to the merits of the Plaintiff's claims.  See Twombly, 550

U.S. at 557-58 ("[S]omething beyond the mere possibility of loss causation must be

alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a

number of other people, with the right to do so representing an in terrorem increment of

the settlement value.")(internal quotation marks and citations omitted).  Right now, the

SAC involves over 6,000 transactions, and each transaction raises a host of factual issues.

The discovery and trial burdens will be enormous unless the Plaintiff eliminates those

transactions that do not raise a plausible specter of actual or constructive fraud.

Accordingly, Counts I through IV will be dismissed with leave to replead to the

extent that the allegations are directed at the Lending Banks.  Upon repleading, the

plaintiff should identify those transactions among the approximate 6,000 identified in

Exhibits B-1 and B-2 that it has a good faith basis to believe constitute fraudulent

transfers.  This may necessitate dropping certain Lending Banks as defendants.  In light

of this conclusion, the Court does not reach the other issues raised by the Lending Banks

(or SPM), including whether the SAC adequately alleges that they knew or should have

known about the Fortgangs' "scheme."

### b.    SPM

Although included as part of Counts I through IV, the SAC contains discrete

allegations directed at SPM, which was not a Lending Bank.  The SAC alleges that on

July 31, 2006, and while insolvent, Fabrikant incurred a $32 million debt to SPM on

account of the MFS's purchase of gold.  (¶¶ 52, 58.)  At least $22 million of the gold was

purchased for the benefit of Fortgang Affiliates -- Clover, SHR, Simmons, and AM-Gold

– to whom the gold had been transferred on a nearly monthly basis between January 16,

2003 and July 31, 2006.  (¶¶ 59-60.)  Fabrikant incurred this obligation to SPM with the

intent to hinder and defraud their creditors, Fabrikant did not receive fair consideration,

and the obligation to SPM was incurred in bad faith.  (¶¶ 61, 63, 117, 118, 123, 124, 128,

129.)  In addition, Fabrikant was insolvent at the time it incurred the obligation, or

satisfied one of the other financial tests associated with a constructive fraudulent transfer

claim.  (See ¶¶ 31, 32, 52, 119, 125, 130.)

     The Court previously dismissed the actual fraudulent transfer claim under Rule

9(b) of the Federal Rules of Civil Procedure because the Amended Complaint failed "to

identify which Fortgang Affiliates were the transferees or the dates of the transfers."

Prior Decision, 394 B.R. at 734.  According to the Plaintiff, the SAC cured this defect.

Paragraph 60 alleges that "[i]t was July 31, 2006, when the obligation to SPM was

ultimately incurred, and thus when the fraudulent transfers were effectively made."

(Memorandum of Law in Opposition to Defendants' Motion to Dismiss, dated Feb. 23,

2009, at 12)(ECF Doc. # 76.)  In other words, the dates when the goods were consigned

to the Fortgang Affiliates are irrelevant.

     The claims against SPM mischaracterize the transaction on which they are based.

According to documents referred to by both SPM and the Plaintiff, the Rhode Island

Hospital Trust National Bank (the "RI Bank") entered into a gold consignment agreement

with MFS and Fabrikant, Hong Kong Ltd. on November 14, 1988, and following a series

of transfers, RI Bank's successor, BankBoston, N.A. ("BankBoston"), and MFS entered

into an Amended and Restated Consignment Agreement as of December 31, 1998

("Amended Consignment").[20]  Among other things, BankBoston agreed to deliver gold

on consignment to MFS from time to time, (Amended Consignment, at ¶ 2), at MFS's

location or such other locations approved by BankBoston.  (Id. at ¶ 3.)  BankBoston held

legal title to the gold, until it was purchased, (id. at ¶ 4), and MFS had the right, subject

to certain limitations, to purchase any consigned gold upon appropriate notice and

payment of the purchase price and any additional fees.  (Id. at ¶ 5.)

SPM eventually succeeded to the interests of BankBoston, and on July 7, 2006,

SPM, Sovereign and MFS entered into the Eighth Amendment to Amended and Restated

Consignment Agreement Dated as of December 31, 1998.  ("Eighth Amendment").[21]

The Eighth Amendment provided for the creation of a $33,000 loan (the "Demand

Loan") from Sovereign to MFS to enable MFS to purchase 50,760 fine troy ounces of

gold that SPM had previously consigned to MFS under the consignment agreement.

(Eighth Amendment at ¶ 2.)  In addition, SPM assigned to Sovereign the security interest

that MFS had granted to SPM under the Second and Amended Security Agreement, dated

as of January 13, 2006, to secure the Demand Loan.  (See id. at ¶ 4.)

The claims against SPM ignore both the consignment relationship and

Sovereign's role in the transaction.  Once SPM delivered gold on consignment, MFS

incurred the obligation to return the gold (which it did not own) or buy it.  Plaintiff does

not challenge these obligations. The only new obligation that MFS incurred on July 7,

2006 was to repay Sovereign's Demand Loan.  The Plaintiff does not challenge this

---

[20]     A copy of the Amended Consignment is annexed to the Subramanian Declaration as Exhibit F.

[21]     A copy of the Eighth Amendment is annexed to the Subramanian Declaration as Exhibit E.

obligation either, and Sovereign is not even a party on Counts I through IV.  Furthermore,
the only transfer of a security interest on July 7, 2006 occurred between SPM and
Sovereign.

Accordingly, Counts I through IV are also dismissed as against SPM with leave to
replead.  Any newly amended complaint should, at a minimum, state the claims against
SPM (or any other non-Lending Bank) separately from the counts asserted against the
Lending Banks.  See FED. R. CIV. P. 10(b).

### 3.    Counts V through VII

Counts V through VII repeat the claims asserted in the corresponding counts of
the Amended Complaint.  These claims do not depend on the collapsing doctrine and
consist of two components.  First, between January 2006 and the Petition Date, Fabrikant
transferred the aggregate sum of $38,890,000 "to several Fortgang Affiliates, specifically
Alpha Diamond Co., Inc., Diamfab PVBA, Fabrikant Trading India, and Fabrikant HK
Trading Ltd."  (¶¶ 137, 145.)  These Fortgang Affiliates "used the Debtors' transfers to
pay down their debts to defendants HSBC, ABN, and IDB in the following amounts:
$14,025,784 to HSBC, $8,364,265 to ABN, and $5,946,592."  (¶¶ 138, 146.)  Second,
between January 2005 and the Petition Date, Fabrikant transferred the aggregate amount
of $10,535,000 to Fortgang Affiliate, VSI.  (¶¶ 139, 147.)  VSI "used the Debtors'
transfers to pay down its debts to defendant Sovereign in the amount of $9,882,351."  (¶¶
140, 148.)  According to the SAC, the initial transfers from the debtors to the Fortgang
Affiliates were actively or constructively fraudulent, (¶¶ 141-43, 150-52), and Sovereign
knew it.  (¶ 149.)

The Court's earlier opinion concluded that the intentional fraudulent transfer allegations in the Amended Complaint were legally insufficient.  Among other things, the Amended Complaint failed to identify the date and amount of each transfer, and instead, aggregated transfers occurring over a two to three year period.  Prior Decision, 394 B.R. at 740.  Furthermore, except in the case of VSI, the Amended Complaint also failed to identify which Fortgang Affiliate received a particular transfer, and instead, lumped the transfers and the transferees together.  Id.  The Amended Complaint was similarly vague in alleging the subsequent transfers from the Fortgang Affiliates to Sovereign.  Except in the case of VSI, it failed to identify which Fortgang Affiliate received a particular transfer, and instead, lumped the transfers and the transferees together.  Id.

The SAC is only a slight improvement.  It continues to lump transfers spanning a two to three year period, and fails to particularize the initial transfers or subsequent transfers.  As this Court previously stated, "allegations that a debtor made an aggregate amount or series of cash or other transfers over a period of time, without further particularization, are insufficient to state an intentional fraudulent transfer claim."  Id. at 733.  Accordingly, Counts V and VI fail to state a claim based upon an initial actual fraudulent transfer.  The Plaintiff is granted leave to replead its intentional fraudulent claim, but it must adhere to the requirements discussed in this opinion and the Prior Decision.

On the other hand, the Court previously concluded that allegations in the Amended Complaint based on constructive fraudulent transfers were legally sufficient, id. at 736, and the Court adheres to that conclusion.  Sovereign's arguments that the VSI payments discharged a pre-existing guaranty obligation owed by MFS and that VSI

36

released its obligations to Sovereign, to the extent they are relevant, are outside the

pleadings and should not be raised on a motion to dismiss.

Settle order on notice consistent with this opinion.  To the extent that the Plaintiff

has been granted leave to replead, the Plaintiff must file and serve its amended complaint

within 45 days of the date of this opinion.

Dated:  New York, New York
        November 10, 2009


                        /s/ *Stuart M. Bernstein*
                        STUART M. BERNSTEIN
                        Chief United States Bankruptcy Judge