UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 (Confirmed) |
| M. FABRIKANT & SONS, INC., et al., | : | Case No. 06-12737 (SMB) |
| | : | Jointly Administered |
| Debtors. | : | |

---------------------------------------------------------------X

|  |  |  |
|---|---|---|
| BUCHWALD CAPITAL ADVISORS LLC, | : | |
| as Trustee of the MFS GUC Trust, | : | |
| | : | |
| Plaintiff, | : | |
| – against – | : | Adv. Proc. No.: 07-2780 |
| | : | |
| JP MORGAN CHASE BANK, N.A., ABN AMRO | : | |
| BANK N.V., BANK OF AMERICA, N.A., HSBC | : | |
| BANK USA, NATIONAL ASSOCIATION, BANK | : | |
| LEUMI USA, ISRAEL DISCOUNT BANK OF | : | |
| NEW YORK, ANTWERPSE DIAMANTBANK, | : | |
| N.V., SOVEREIGN PRECIOUS METALS, LLC, | : | |
| and SOVEREIGN BANK, | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## REGARDING DEFENDANTS' MOTION TO
## DISMISS THE THIRD AMENDED COMPLAINT

**A P P E A R A N C E S :**

SUSMAN GODFREY LLP
Attorneys for Plaintiff
654 Madison Avenue
New York, New York 10065

    Stephen D. Susman, Esq.
    Arun Subramanian, Esq.
    Jonathan J. Ross, Esq.
    Robert Rivera, Jr., Esq.
      Of Counsel

HAHN & HESSEN LLP
Attorneys for Defendant JP Morgan Chase Bank, N.A.
488 Madison Avenue
New York, New York 10022

    Steven J. Mandelsberg, Esq.
      Of Counsel

CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for Defendant ABN Amro Bank N.V.
One World Financial Center
New York, New York 10281

    Gregory M. Petrick, Esq.
    Ingrid Bagby, Esq.
      Of Counsel

REIMER & BRAUNSTEIN LLP
Attorneys for Defendant Bank of America, N.A.
Three Center Plaza, 6th Floor
Boston, Massachusetts 02108

    Paul S. Samson, Esq.
      Of Counsel

PHILLIPS LYTLE LLP
Attorneys for Defendant HSBC Bank USA
437 Madison Avenue, 34th Floor
New York, New York 10022

    William J. Brown, Esq.
      Of Counsel

CULLEN AND DYKMAN LLP
Attorneys for Defendant Antwerpse Diamantbank, N.V.
100 Quentin Roosevelt Boulevard
Garden City, New York 11530

    Matthew G. Roseman, Esq.
      Of Counsel

LECLAIR RYAN, PC
Attorneys for Defendants Sovereign Precious
  Metals, LLC and Sovereign Bank
830 Third Avenue – Fifth Floor
New York, New York 10022

    Michael T. Conway, Esq.
      Of Counsel

HERRICK, FEINSTEIN LLP
Attorneys for Defendant Bank Leumi USA
2 Park Avenue
New York, New York 10016

    Andrew C. Gold, Esq.
      Of Counsel

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Attorneys for Defendant Israel Discount Bank of New York
30 Rockefeller Plaza
New York, New York 10112

    Russell L. Reid, Esq.
      Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      The Court has previously entertained two motions to dismiss prior versions of the

plaintiff's complaint.  In Official Committee of Unsecured Creditors v. JP Morgan Chase

Bank, N.A. (In re M. Fabrikant & Sons, Inc.), 394 B.R. 721 (Bankr. S.D.N.Y. 2008)

("Fabrikant I"), the Court granted in part and denied in part the motion to dismiss the

Amended Complaint, dated Mar. 27, 2008 ("AC") (ECF Doc. # 54) with leave to replead.

In Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant

& Sons, Inc.), Adv. Proc. No. 07-2780, 2009 WL 3806683 (Bankr. S.D.N.Y. Nov. 10,

2009) ("Fabrikant II"), the Court again granted in part and denied in part the motion to

dismiss the Second Amended Complaint, dated Dec. 5, 2008 ("SAC") (ECF Doc. # 63),

with leave to replead. The Court also dismissed a related amended complaint, dated Dec.

5, 2008 (Adv. Proc. # 08-1734, ECF Doc. # 3) that asserted two claims included in the

SAC.

      The plaintiff subsequently filed a Third Amended Complaint, dated Dec. 28, 2009

("TAC") (ECF Doc. # 95).  The defendants again moved to dismiss, and their motion is

the subject of this opinion.  For the reasons that follow, Counts I through IV are

dismissed with prejudice, Counts VIII through X are dismissed with prejudice to the

extent they assert claims based on actual fraudulent transfers, but the motion to dismiss

these Counts is otherwise denied, Count XI is dismissed with prejudice, and the motion to

dismiss Count XII is granted in part and denied in part.  The motion to dismiss Counts V

and VI is denied as to Sovereign Bank ("Sovereign"), and granted as to Sovereign

Precious Metals, LLC ("SPM") with leave to replead.  Finally, the motion to dismiss

Count VII is granted with leave to replead.

## BACKGROUND[1]

### 1.    The "Scheme Claims" (Counts I through IV)

M. Fabrikant & Sons, Inc. ("MFS") and Fabrikant-Leer International, Ltd. ("FLI,"

and collectively with MFS, "Fabrikant" or the "debtors") are corporations organized

under New York law.  (¶¶ 18-19.)  MFS has been in the diamond and jewelry business

since 1895, and for many years, was one of the largest and most prominent diamond and

jewelry wholesalers in the world.  (¶ 31.)  Charles Fortgang and Matthew Fortgang own

approximately 32% of the stock of MFS.  (¶ 32.)  At all relevant times, Charles and

Matthew Fortgang served, respectively, as the chairman and president of the debtors, and

controlled both debtors.  (¶ 32; see ¶ 33.)  The remainder of MFS's stock is owned

through a trust by Marjorie Fortgang and Susan Fortgang and by employees or former

employees of MFS.  (¶ 32.)  Finally, MFS owns 82% of the stock of FLI.  (Id.)

---

[1]        The discussion is based on the allegations in the TAC and the documents cited in and relied on in
drafting the TAC.  The parenthetical notation "(¶ _)" refers to paragraphs in the TAC.

Charles and Matthew Fortgang, and trusts of which Charles, Matthew and Susan Fortgang were beneficiaries, own a group of 47 companies engaged in the diamond and jewelry business (the "Fortgang Affiliates"). (¶ 34.) With few exceptions, neither debtor had any ownership interest in any of the Fortgang Affiliates. (Id.) The Fortgang Affiliates are listed on Exhibit A to the TAC.

For many years prior to the Petition Date, the debtors borrowed money from the defendants J.P. Morgan Chase Bank, N.A. ("JPMC"), ABN AMRO Bank N.V. ("ABN"), Bank of America ("BOA"), HSBC Bank USA, N.A. ("HSBC"), Bank Leumi USA ("BL"), Israel Discount Bank of New York ("IDB"), Antwerpse Diamantbank, N.V. ("ADB," and collectively, the "Lending Banks"). Between January 2003 and the Petition Date, and while insolvent, the debtors incurred the following aggregate obligations to the Lending Banks:

| Lending Bank | Amount ($) |
|---|---|
| JPMC | 35,838,000 |
| ABN | 44,290,000 |
| BOA | 10,475,000 |
| HSBC | 12,075,000 |
| BL | 11,592,000 |
| IDB | 9,660,000 |
| ADB | 5,454,000 |
| **Total** | **129,384,000** |

(¶ 130.)

These amounts reflect the unpaid balances due to the Lending Banks, i.e., the difference between the advances and the repayments as of the Petition Date.  In October 2004, MFS granted security interests in all of its assets to the Lending Banks to secure their claims.  (¶ 124.)

As the Lending Banks were making loans to the debtors, the debtors were improperly transferring the loan proceeds to the Fortgang Affiliates.  These retransfers fell into one or more of the following groups:

### a.    The Circular Loans

Pursuant to an arrangement with the Lending Banks, MFS made "massive" transfers to the Fortgang Affiliates each December to allow the Fortgang Affiliates to "clean up" their loans, and those Fortgang Affiliates made "massive transfers" back to MFS every January to enable MFS to "clean up" its own loans to the Banks (the "Circular Loans").  (¶¶ 37-39.)  The TAC Exhibit C lists "examples" of these Circular Loans.

Most of the money that MFS transferred to the Fortgang Affiliates was not repaid for two reasons; the money would be retransferred out at a later date, and the amounts transferred were insufficient to cover the "loans" that already existed.  (¶ 118.)

### b.    Loans

The debtors "booked" $34,010,734 in "loans" to the Fortgang Affiliates that were never repaid.  (¶¶ 3, 44, 58.)  These "loans" are identified in Exhibit B to the TAC.

### c.    Investments

On November 30, 2004, MFS transferred $3 million to Brilliant Trading, Brilliant Trading repaid $510,000, and $2.49 million remains unpaid.  (¶¶ 3, 44, Ex. B.)  The net transfer was "booked as an ambiguous 'investment' in affiliate Brilliant Trading."  (¶ 44.)

### d.    "Due From"

The debtors transferred at least $22,329,467 to the Fortgang Affiliates that were "booked" as "due from" the Fortgang Affiliates and remained unpaid as of the Petition Date.  (¶¶ 5, 46, 59.)  The ledgers do not include any detail concerning collateral or maturity dates.  (¶ 5.)

### e.    "Pay Down" Transfers

The debtors transferred over $38 million to certain Fortgang Affiliates that the Fortgang Affiliates used to repay their own obligations to certain of the Lending Banks. (¶ 7.)  These may be part of the Circular Loans and may also involve the same transfers from the debtors to the Fortgang Affiliates that the plaintiff seeks to avoid and recover from ABN, IDB and Sovereign as mediate or immediate transferees pursuant to Counts VIII, IX and X.

These six categories total $96,830,201.  The plaintiff seeks to collapse the Scheme Claims, contending that the Lending Banks knew or should have known that the debtors would reconvey the proceeds of the bank loans to the Fortgang Affiliates through actual or constructive fraudulent transfers.  The TAC implicitly recognizes that the debtors and the Fortgang Affiliates transacted legitimate business with each other, and does not seek to impose liability against the Lending Banks where the debtors used the proceeds of bank loans to pay the Fortgang Affiliates for goods and services.  Thus, the

transfers corresponding to the "loans" and "investments," totaling $36,500,734, "are entirely separate from the companies' trade accounts relating to merchandise sales and purchases between MFS and the Fortgangs' other companies."  (¶ 4; <u>accord</u> ¶ 45.) Similarly, the "due from" transfers in the aggregate amount of $22,329,467 were "separate and apart from the accounts relating to at least superficially legitimate expenses of MFS and FLI, and the trade accounts"  (¶ 5; <u>accord</u> ¶ 46.)

### 2.    The Consignment Claim (Counts V through VII)

Between January 16, 2003 and July 31, 2006, gold transfers were made nearly on a monthly basis to Clover, SHR, Simmons, and AM-Gold (the "Gold Transferee Affiliates"), a subset of the Fortgang Affiliates.  (¶ 73.)  The debtors did not have any ownership interest in the Gold Transferee Affiliates.  (¶ 73.)  On July 7, 2006, MFS borrowed $33 million from SPM and Sovereign, and immediately transferred the proceeds to SPM "to pay for and buy outright gold that had previously been loaned on consignment by SPM."  (¶ 69.)  At least $22 million of the gold was purchased for the benefit of the Fortgang Affiliates to which it had been delivered by SPM.  (¶ 72; <u>see</u> ¶ 44.)  This transaction was independent of the existing consignment facility between the parties, which did not obligate MFS to pay for the consigned gold or to borrow $33 million to buy the gold.  (¶ 70.)

SPM and Sovereign shared a security interest in the debtors' assets to secure the loan.  (¶ 69.)  The security interest originally "granted on or about October 28, 2004 to SPM was converted into security for a new loan to cover gold."  (¶ 71.)  "Sovereign and SPM acted in bad faith in charging MFS for $33 million of gold — paid for with yet another loan to MFS — knowing that at least $22 million of the gold purchased by MFS

in July 2006 had been delivered to and was in the possession of certain Fortgang

Affiliates, not MFS, and that MFS did not receive fair or reasonably equivalent value in

exchange for incurring the obligation to pay for that gold."  (¶ 125; accord ¶ 74.)

### 3.    The Subsequent Transfers Claims (Counts VIII through X)

Between January 2006 and the Petition Date, the debtors made actual or

constructively fraudulent transfers in the aggregate amount of $38,890,000 to several

Fortgang Affiliates – Alpha Diamond Co., Inc., Diamfab PVBA, Fabrikant Trading India,

and Fabrikant HK Trading Ltd. – and the Fortgang Affiliates used those proceeds to

repay their own debts to defendants HSBC, ABN, and IDB in the following amounts:

| Bank | Amount ($) |
|------|-----------|
| ABN | 8,364,265 |
| HSBC | 14,025,784 |
| IDB | 5,946,592 |
| **Total** | **28,336,641** |

 (¶¶ 121, 167-74; 175-83.)  On motion of the plaintiff, the Court subsequently dismissed

the claims against HSBC asserted in Counts VIII, IX and X with prejudice.  (Order

Dismissing Certain Claims Against HSBC Bank USA, National Association, dated May

27, 2010) (ECF Doc. # 122).)

In addition, from January 2005 until the Petition Date, the debtors made actual or

constructive fraudulent transfers in the total amount of $10,535,000 to another Fortgang

Affiliate, VSI, LLC ("VSI").  (¶¶ 169, 177.)  VSI paid $9,882,351 from these funds to

defendant Sovereign Bank ("Sovereign") in satisfaction of VSI's own debt.  (¶¶ 170,

178.)  In Counts VIII through X, the plaintiff seeks to avoid and recover the Subsequent

Transfers from ABN, IDB and Sovereign as mediate or immediate transferees of Alpha

Diamond Co., Inc., Diamfab PVBA, Fabrikant Trading India, Fabrikant HK Trading Ltd

and VSI.

**4.      The Preferential Payments (Count XI)**

Count XI seeks to avoid and recover the following preferential transfers made by

the debtors to various defendants within 90 days of the Petition Date:

| Defendant | Amount ($) |
|---|---|
| ABN | 7,695,943 |
| ADB | 397,933 |
| BOA | 2,064,495 |
| BL | 644,195 |
| HSBC | 696,112 |
| IDB | 563,186 |
| JPMC | 7,732,672 |
| Sovereign | 1,346,022 |
| SPM | 754,974 |
| **Total** | **21,895,532** |

(¶ 190.)[2]

---

[2]      The TAC alleges these transfers with specificity.

The TAC alleges that these transfers were made on account of antecedent debts, while the debtor was insolvent, and the transfers enabled these defendants to receive more than they would have received in a hypothetical chapter 7 case if the transfers had not been made, and instead, the defendants received payment of their claims under chapter 7 of the Bankruptcy Code.  (See ¶¶ 190-96.)

5.      **Section 502(d) claim (Count XII)**

Count XII alleges, upon information and belief, that the defendants filed proofs of claim or were scheduled as creditors.  (¶ 200.)  The defendants received fraudulent or preferential transfers, (¶ 201), and their claims must be disallowed under 11 U.S.C. § 502(d).  (¶ 202.)

## DISCUSSION

A.      **Counts VIII through X**

With two immaterial exceptions, Counts VIII through X reallege verbatim Counts V through VII of the SAC.[3]  The Court previously dismissed Counts V through VII of the SAC to the extent they attempted to allege claims based on actual fraudulent transfers but denied the motion to dismiss the claims to the extent they alleged claims based on constructive fraudulent transfers.  Fabrikant II, 2009 WL 3806683, at *15-16.  For the same reasons, the pending motion to dismiss is granted with respect to the actual fraudulent transfer claims asserted in Counts VIII through X but denied with respect to

---

[3]      Paragraph 149 of the SAC alleged, inter alia, that "Sovereign actively participated in the prior transactions between its affiliate SPM and the Debtors, as well as the July 2006 transaction giving rise to Fabrikant's $32 million secured obligation to SPM."  Paragraph 179 of the TAC reads "Sovereign actively participated in the prior transactions between its affiliate SPM and the Debtors, as well as the July 2006 transaction giving rise to Fabrikant's $33 million secured obligation to SPM and Sovereign."  The new material, which is underscored, does not affect the disposition of the defendants' motion.

the constructive fraudulent transfer claims.  As noted, however, all of the claims against

HSBC asserted in Counts VIII through X have already been dismissed with prejudice.

**B.    Count XI**

    **1.    Standing**

In Fabrikant II, the Court dismissed the preference claims for lack of standing.

The Plan vested the preference claims in the Shared Assets Trust ("SAT").  Fabrikant II,

2009 WL 3806683, at *6-7.  Although the Plan allowed the SAT to abandon claims to the

plaintiff, the Shared Assets Trust Agreement[4] required the SAT Trustee to obtain the

approval of the Shared Assets Beneficiary Committee.  Id., at *8.  Action by the

Beneficiary Committee required the presence of a quorum consisting of at least three

members of the Beneficiary Committee unless the majority of the Beneficiary Committee

voted to allow a single member to exercise the power of the Beneficiary Committee with

respect to a particular matter. [5]  (See Shared Asset Trust Agreement, § 2.2(a) ("Except as

otherwise provided in this Trust Agreement, no Beneficiary Committee business may be

conducted absent a quorum.").)

The SAC failed to allege that the SAT had abandoned the preference claims.

Fabrikant II, 2009 WL 3806683, at *8.  Furthermore, additional evidence submitted by

the plaintiff outside of the SAC, in the form of an email exchange between counsel for

the SAT and the plaintiff, failed to show an abandonment.  Instead, it showed that the

---

[4]    An unexecuted copy of the Shared Assets Trust Agreement is included as Exhibit to the Plan
Supplement.  (Case No. 06-12737, ECF Doc. # 469.)  The Court takes judicial notice of the contents of the
document.

[5]    Members of the Beneficiary Committee could also act by unanimous written consent in lieu of a
meeting.

plaintiff's assertion of the preference claims was the product of an agreement between counsel rather than any action by the SAT or the Beneficiary Committee.  Id.

The TAC realleges the same preference claim,[6] and attempts to fill in the missing allegation of abandonment through the following averment:

> Counsel for the Shared Asset Trust informed the Shared Assets Trust Beneficiary Committee's members that the preference claim relating to these transfers should be brought by the GUC Trust, rather than by the Shared Asset Trust.  To the extent this cause of action initially belonged to the Shared Asset Trust, it was abandoned to the GUC Trust pursuant to the [Plan].

(¶ 198.)

The new allegation fails to cure the defect noted in Fabrikant II.  It merely alleges that the SAT "informed" the Beneficiary Committee's members that the preference claims "should" be brought by the plaintiff, and implies that the Beneficiary Committee agreed to or acquiesced in the recommendation.  The Shared Asset Trust Agreement, however, required that a duly constituted quorum of the Beneficiary Committee meet and affirmatively abandon the preference claim.[7]  Accordingly, the TAC fails to allege that the plaintiff has standing to pursue the preference claims.

## 2.    Statute of Limitations

The preference defendants had also moved to dismiss the preference claims asserted in the SAC on the ground that they were time-barred.  The Court did not reach

---

[6]    The TAC omits the allegations previously asserted against Antwerpse United Diamant, N.V. in the SAC.

[7]    The TAC does not allege that the Beneficiary Committee authorized one member to act in its stead, or that the Beneficiary Committee abandoned the preference claim through unanimous written consent in lieu of a meeting.

this issue, the defendants have renewed the argument and the parties have relied primarily

on the briefing submitted in connection with the motion to dismiss the SAC. The

defendants earlier contended that the deadline for bringing claims was October 1, 2007.

The preference claims were not asserted until December 1, 2008 when the plaintiff filed

the original (uncorrected) SAC. The plaintiff countered that the preference claims

"related back" to the timely claims. See generally, FED. R. CIV. P. 15(c)(1).

Rule 15(c)(1)(B) states that "[a]n amendment to a pleading relates back to the

date of the original pleading when . . . the amendment asserts a claim or defense that

arose out of the conduct, transaction, or occurrence set out — or attempted to be set out

— in the original pleading." FED. R. CIV. P. 15(c)(1)(B). "The principal inquiry is

whether adequate notice of the matters raised in the amended pleading has been given to

the opposing party 'by the general fact situation alleged in the original pleading.'" In re

Chaus Sec. Litig., 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992) (quoting Contemporary

Mission, Inc. v. New York Times Co., 665 F. Supp. 248, 255 (S.D.N.Y. 1987), aff'd, 842

F.2d 612 (2d Cir. 1988), cert. denied, 488 U.S. 856 (1988)); accord Rosenberg v. Martin,

478 F.2d 520, 526 (2d Cir. 1973) (Friendly, C.J.), cert. denied, 414 U.S. 872 (1973;

Asset Value Fund Ltd. P'ship v. Care Grp., Inc., 179 F.R.D. 117, 121 n.3 (S.D.N.Y.

1998); Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. Pirelli

Commc'ns. Cables and Sys. USA LLC (In re 360networks (USA), Inc.), 367 B.R. 428,

433 (Bankr. S.D.N.Y. 2007).

New allegations in an amended pleading "relate back" if they amplify the facts

alleged in the original pleading or set forth those facts with greater specificity. In re

Chaus Sec. Litig., 801 F. Supp. at 1264; Oliner v. McBride's Indus., Inc., 106 F.R.D. 9,

12 (S.D.N.Y. 1985); see 3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE §
15.19[2], at 15-98–99 (3d ed. 2010). A revised pleading will also relate back if it asserts
new legal theories based on the same series of transactions or occurrences. White v.
White Rose Food, 128 F.3d 110, 116 (2d Cir. 1997); 3 MOORE'S § 15.19[2], at 15-99–
100. Conversely, an amended complaint will not relate back if it is based on new facts
and different transactions. In re Chaus Sec. Litig., 801 F. Supp. at 1264; CIT
Group/Factoring Mfrs. Hanover, Inc. v. Srour (In re Srour), 138 B.R. 413, 418 (Bankr.
S.D.N.Y. 1992). In avoidance litigation, each transfer is treated as a separate transaction
for purposes of applying the "relation back" doctrine. See 360networks (USA) Inc., 367
B.R. at 434 ("[A] preference action based on one transfer does not put defendant on
notice of claims with respect to any other unidentified transfers."); Metzeler v. Bouchard
Transp. Co., Inc. (In re Metzeler), 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1984) (different
fraudulent transactions separate and distinct for purposes of Rule 15(c)).

With only one exception, the original Complaint, the only timely pleading, neither
identified nor discussed any specific payment by either of the debtors to any of the
defendants. The Scheme Claims turned on the transfers by Lending Banks to the debtors,
and the debtors' reconveyance of the loan proceeds to the Fortgang Affiliates. The
Subsequent Transfer Claims sought to recover funds paid by the debtors to the Fortgang
Affiliates that were subsequently transferred by the Fortgang Affiliates to specific
Lending Banks. Finally, although the Consignment Claim included allegations that MFS
paid SPM, the payment occurred before the 90 day preference period, and could not have
included the payments to SPM listed in Count XI.

The only possible <u>general</u> reference to payments made to the Lending Banks appeared in Count IV of the original Complaint. There, the plaintiff alleged that "[f]rom October 2004 until it sold its claim, the defendants received liens and security interests <u>and proceeds thereof</u> from Fabrikant to secure the fraudulent obligations previously alleged." (<u>Complaint</u>, dated Oct. 1, 2007, at ¶ 71 (ECF Doc. # 1) (emphasis added).) The reference to the receipt of "proceeds" may refer to payments made on account of the security interests that the Lending Banks obtained in October 2004. Nevertheless, this passing reference appears only once and is insufficient to place the Lending Banks on notice that the plaintiff was seeking to recover any specific transfers made by the debtors to the Lending Banks within 90 days of the Petition Date. As each transfer is deemed a separate transaction, the preference claims do not amplify any of the transactions alleged in the original Complaint.

Accordingly, the preference claims do not "relate back" to the Complaint, and are time-barred. This presents an alternative ground for dismissing Count XI.

## C.    Counts I through IV

Counts I through IV, which assert the principal Scheme Claims, have proved the most controversial. As the history of these claims provides context to the disposition of the pending motion, I recount it at length.

### 1.    Fabrikant I

The AC alleged that between January 2003 and the Petition Date, the Lending Banks made aggregate loans in the amount of $129,384,000 to the debtors, and the debtor's fraudulently reconveyed those proceeds to the Fortgang Affiliates with the actual

or constructive knowledge of the Lending Banks.  The Scheme Claims depended, as they still do, on the ability to collapse the two steps into a single integrated transaction.  To collapse the two steps, the plaintiff had to plead and ultimately prove that (1) the consideration that debtors received from the Lending Banks was retransferred fraudulently to the Fortgang Affiliates, and (2) the Lending Banks had actual or constructive knowledge of the entire scheme.

In Fabrikant I, the Court dismissed the Scheme Claims asserted in the AC with leave to replead.  The Court concluded that the AC sufficiently pleaded step one; the Lending Banks had transferred approximately $129.4 million to the debtors who, in turn, made constructive fraudulent transfers of the loan proceeds to the Fortgang Affiliates.  Id. at 736.  The AC implied that the $129.4 million was the aggregate amount of specific loans rather than the unpaid balance of a much larger number.

The AC nevertheless failed to plead step two – that the Lending Banks' had actual or constructive knowledge of the entire scheme.  The plaintiff alleged that the Lending Banks knew that the debtors did not own the Fortgang Affiliates, that MFS funded the Fortgang Affiliates with the proceeds of the Lending Banks' loans, that MFS's financial condition was deteriorating and that the consideration received by MFS from the Fortgang Affiliates would have little or no value.  The JPMC Report, a report commissioned by JPMC in 2002 to assist it in deciding to extend an unsecured credit facility to MFS in the sum of $51,500,000, provided the principal support for the plaintiff's "knowledge" allegations.

17

The JPMC Report did not support the allegations.  It indicated that MFS engaged in significant legitimate business transactions with many of the Fortgang Affiliates.  MFS purchased most of its inventory from the Fortgang Affiliates, and as of October 31, 2002, owed the Fortgang Affiliates $62,412,054 more than the Fortgang Affiliates owed to MFS.  In short, the Fortgang Affiliates were financing MFS and not the other way around.  The JPMC Report also showed that even after ignoring the affiliate receivables, MFS had substantial unencumbered assets.  Fabrikant I, 394 B.R. at 737.  Ultimately, the JPMC Report failed to support the conclusory statements that the Lending Banks knew that the debtors did not own the Fortgang Affiliates or that MFS was insolvent at the time of the transfers or was rendered insolvent by the transfers or that the transfers between MFS and the Fortgang Affiliates related to anything other than legitimate business transactions.[8]  Id. at 738.

The AC's attempt to ascribe motives to the Lending Bank's knowing participation in the Fortgangs' fraudulent scheme was met with equal skepticism.  The plaintiff contended that the Lending Banks continued to advance loans to MFS to enhance their recognition and reputation as lenders in the jewelry industry and to keep the Fortgangs' business, content that the Fortgangs' guaranties and their liens would protect them.  Id. at 738-39.  The Court ruled that the additional allegations were conclusory and concluded that "the Amended Complaint does not set forth a plausible claim that the [Lending Banks] knew or should have known that the debtors were engaged in a multi-year scheme

---

[8]       The JPMC Report also showed net loans to the Fortgang Affiliates aggregating over $30 million, but this sum was dwarfed by the purchase and sale transactions.  Fabrikant I, 394 B.R. at 737.

to make constructive fraudulent transfers of the [Lending Banks' loans] to the Fortgang

Affiliates." Id. at 739.

### 2. Fabrikant II

The Scheme Claims, as repleaded in the SAC, exposed the fundamental flaw in

the plaintiff's legal theory that was not apparent to the Court until then. The $129.4

million advanced by the Lending Banks did not represent the aggregation of specific

transfers; instead, the number reflected the unpaid balance of all loans, i.e., the "net

transfers," made by the Lending Banks to the debtors during the approximate four year

period covered by the SAC. The SAC attached two exhibits that purported to identify the

fraudulent transfers underlying the Scheme Claims. The exhibits spanned 157 pages and

listed approximately 6,000 transfers between (1) the Lending Banks and the debtors and

(2) the debtors and the Fortgang Affiliates. The amounts of many of the transfers listed

in the SAC exhibits from the debtors to the Fortgang Affiliates were for small fractional

dollar amounts – often less than $100 – suggesting that the particular transfer paid a bill

for merchandise. Fabrikant II, 2009 WL 3806683, *13. The SAC nevertheless

contended that each of these transfers was fraudulent.

It was implausible to contend that every transfer from the debtors to the Fortgang

Affiliates was fraudulent. The SAC again relied on the JPMC Report. As discussed, it

showed that the debtors had engaged in legitimate business transactions with the

Fortgang Affiliates, and owed much more to the Fortgang Affiliates than the Fortgang

Affiliates owed to them. The SAC also cited to and relied on the debtors' financial

statements, which confirmed that MFS purchased a substantial amount of merchandise

from the Fortgang Affiliates. For the year ended July 31, 2003, those purchases totaled

$208,389,921.  (Appendix of Exhibits to the Joint Motion to Dismiss, dated January 20,

2009 (the "Appendix"), Ex. K, at 8 ) (ECF Doc. # 70).) [9]  Subsequent statements did not

list the amounts purchased from affiliates, but showed that during the years ended July

31, 2004 and 2005, MFS made purchases of polished diamonds amounting to

$284,601,188, (id., Ex. M, at 15), and $210,755,883, (id., Ex. O, at 16), respectively, and

each financial statement acknowledged that "[a] significant portion of the Company's

purchases are from affiliated companies."  (Id., Ex. M, at 8; Ex. O, at 8.)  For the six

months ending January 31, 2006, the purchases of polished diamonds totaled

$88,347,780, (id., Ex. P, at 17), and again, "[a] significant portion of the Company's

purchases are from affiliated companies."  (Id., Ex. P, at 9.) [10]

The plaintiff's "net transfer" theory also depended on the assumption that every

receivable created by a transfer to a Fortgang Affiliate was valueless at the time it was

incurred simply because it was never repaid.  Fabrikant II, 2009 WL 3806683, *13.

However, the value of each receivable had to be determined at the time it was created and

not after a default.  Id.  The SAC alleged that the affiliate "receivables severely degraded

over time," essentially conceding that they had greater value at the time that the

corresponding debts were incurred.  See id.

The SAC did separately identify nine sets of two-step transactions that might be

subject to collapsing, and the Court acknowledged that the 6,000 transactions listed in the

---

[9]    The Appendix was submitted in support of the motion to dismiss the SAC.  It included several sets
of financial statements pertaining to Fabrikant covering the period from January 31, 2003 through January
31, 2006.  (Id., Exs. J-P.)  The SAC referred generally to Fabrikant's financial statements, and plaintiff's
counsel agreed during oral argument that the Court could consider these Exhibits.  (Transcript of Hearing,
held Feb. 26, 2009, at 86-87) (Case No. 06-12737, ECF Doc. # 976.)

[10]    The financial statement for the year ending July 2006, if any, was not provided.

exhibits might include others.  Id.  Accordingly, the Court dismissed the Scheme Claim

counts with the admonition that "[u]pon repleading, the plaintiff should identify those

transactions among the approximate 6,000 identified in Exhibits B-1 and B-2 that it has a

good faith basis to believe constitute fraudulent transfers."  Id. at *14.

    With this background, we turn to Counts I through IV of the TAC.  Before doing

so, it is worthwhile to review both the rules that govern motions to dismiss under Rule

12(b)(6) of the Federal Rules of Civil Procedure as well as the elements of the plaintiff's

collapsing claim.

### 3.    Standards Governing the Motion

    "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v.

Iqbal, 129 S. Ct. 1937, 1949 (2009) (citations omitted); accord Bell Atlantic Corp. v.

Twombly, 550 U.S. 544, 570 (2007).  Iqbal outlined a two-step approach in deciding a

motion to dismiss.  Fowler v. U.P.M.C. Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)

("The Supreme Court's opinion in Iqbal extends the reach of Twombly [to civil cases] . . .

. [and offers] a two-part analysis.").  First, the court should begin by "identifying

pleadings that, because they are no more than [legal] conclusions, are not entitled to the

assumption of the truth."  Iqbal, 129 S. Ct. at 1950.  Threadbare recitals of the elements

of a cause of action supported by conclusory statements are not factual.  See id. at 1949.

Second, the court should give all "well-pleaded factual allegations" an assumption of

veracity and determine whether, together, they plausibly give rise to an entitlement of

relief.  Id. at 1950.  Plausibility requires more than a "sheer possibility" of wrongdoing—

the plaintiff must plead sufficient factual content to allow the court "to draw the

reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949.

Determining whether a claim is plausible is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." Id. at 1950.

"[C]ourts must consider the complaint in its entirety, as well as other sources

courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308,

322 (2007). Courts may also consider "any written instrument attached to the complaint,

statements or documents incorporated into the complaint by reference, legally required

public disclosure documents filed with the SEC, and documents possessed by or known

to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); accord Roth v. Jennings, 489 F.3d 499,

509 (2d Cir. 2007); Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir.

2002); Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000). "Where a plaintiff's

conclusory allegations are clearly contradicted by documentary evidence incorporated

into the pleadings by reference, however, the court is not required to accept them."

Labajo v. Best Buy Stores, L.P., 478 F. Supp.2d 523, 528 (S.D.N.Y. 2007); accord Kuhne

v. Midland Credit Mgmt., Inc., No. 06 Civ. 5888(DC), 2007 WL 2274873, at *1

(S.D.N.Y. Aug. 09, 2007); Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400

(S.D.N.Y. 2002).

Here, the TAC relied on the JPMC Report (¶¶ 96, 97), as well as the debtors'

financial statements. (¶¶ 50, 55, 81, 97.) The specific financial statements were attached

to the Appendix submitted in connection with the motion to dismiss the SAC and

22

resubmitted at my request on the current motion.  The plaintiff's counsel again agreed

that I can consider the financial statements in deciding the pending motion.  (Transcript

of hearing held May 27, 2010, at 60, 63 (ECF Doc. # 123).)

In addition, allegations of intentional fraudulent transfer must satisfy Rule 9(b) of

the Federal Rules of Civil Procedure.[11]  Sharp Int'l Corp. v. State Street Bank & Trust

Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 56 (2d Cir. 2005).  The complaint must specify

the "particulars" of each transfer including "the property that was allegedly conveyed, the

timing and frequency of those allegedly fraudulent conveyances, [and] the consideration

paid."  United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d

198, 221 (S.D.N.Y. 2002); accord Flannigan v. Vulcan Power Group, L.L.C., 712 F.

Supp. 2d 63, 67 (S.D.N.Y. 2010); Adelphia Recovery Trust v. Bank of America, N.A.,

624 F. Supp. 2d 292, 336 (S.D.N.Y. 2009).  Claims for constructive fraudulent transfer

need only satisfy the less rigorous requirements of Rule 8(a),[12] and "give the defendant

fair notice of what the plaintiff's claim is and the grounds upon which it rests."

---

[11]    Rule 9(b) states:

    In alleging fraud or mistake, a party must state with particularity the circumstances
    constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a
    person's mind may be alleged generally.

[12]    Rule 8(a) of the Federal Rules of Civil Procedure states:

    A pleading that states a claim for relief must contain:

    (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court
    already has jurisdiction and the claim needs no new jurisdictional support;

    (2) a short and plain statement of the claim showing that the pleader is entitled to relief;
    and

    (3) a demand for the relief sought, which may include relief in the alternative or different
    types of relief.

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Conley v. Gibson, 355

U.S. 41, 47 (1957)).

### 4.    The Elements of the Collapsing Claim

As discussed in Fabrikant I, under appropriate circumstances, multiple

transactions will be collapsed and treated as steps in a single transaction for analysis

under the fraudulent conveyance laws.  HBE Leasing Corp. v. Frank, 48 F.3d 623, 635

(2d Cir. 1995); Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993) ("[A]n allegedly

fraudulent conveyance must be evaluated in context; [w]here a transfer is only a step in a

general plan, the plan must be viewed as a whole with all its composite implications.")

(internal quotation marks and citations omitted).  A party seeking to collapse a series of

transactions must satisfy two elements, or prongs.  First, "the consideration received from

the first transferee must be reconveyed by the debtor for less than fair consideration or

with an actual intent to defraud creditors."  HBE Leasing, 48 F.3d at 635.  Typically, the

borrower acts as a conduit, and the consideration immediately passes to the third party.

E.g., United States v. Tabor Court Realty Corp., 803 F.2d 1288, 1302 (3d Cir.1986), cert.

denied, 483 U.S. 1005 (1987); Crowthers McCall Pattern, Inc. v. Lewis, 129 B.R. 992,

998 (S.D.N.Y. 1991); see Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919

F.2d 206, 213 n.12 (3d Cir. 1990) ("'Simultaneity' and 'purpose' are key to evaluating

the transactions.")  If the debtor retains the consideration, or transfers it for valuable

consideration, its estate is not unfairly diminished and the initial transfer is not

fraudulent.  HBE Leasing, 48 F.3d at 635; see Atlanta Shipping Corp. v. Chemical Bank,

818 F.2d 240, 249 (2d Cir. 1987) (bank loan used to repay valid insider debt did not

diminish the debtor's assets and the bank loan was not made or repaid in bad faith).

24

Furthermore, funds that are used for legitimate corporate purposes, including risky or

speculative investments, are not subject to avoidance and recovery as fraudulent

transfers.  Official Committee of Unsecured Creditors v. Morgan Stanley & Co. (In re

Sunbeam Corp.), 284 B.R. 355, 371 (Bankr. S.D.N.Y. 2002).

Second, the initial transferee "must have actual or constructive knowledge of the

entire scheme that renders the exchange with the debtor fraudulent."  HBE Leasing, 48

F.3d at 635; accord In re Best Prods. Co., Inc., 168 B.R. 35, 56-57 (S.D.N.Y. 1994)

(courts frequently examine the defendant's knowledge "of the structure of the entire

transaction and . . . whether its components were part of a single scheme") (internal

quotation marks and citation omitted); Sunbeam, 284 B.R. at 370 ("Courts have

'collapsed' a series of transactions into one transaction when it appears that despite the

formal structure erected and the labels attached, the segments, in reality, comprise a

single integrated scheme when evaluated focusing on the knowledge and intent of the

parties involved in the transaction.").  The court must examine the knowledge of each

participant separately.  See Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 502-03

(N.D. Ill. 1988) (concluding that the complaint was sufficient to implicate the LBO

lenders but not certain shareholders who were "innocent pawns" in the scheme).

In assessing a collapsing claim, a court must focus on the interdependence of the

multiple transactions and whether the participants knew or should have known that no

transaction would occur unless all of the other transactions occurred.  See Voest-Alpine,

919 F.2d at 212 (collapsing transactions where each part of the transaction was dependent

on the occurrence of the other and the defendant would not have consented to one of the

transactions if the other would not occur); Official Committee of Unsecured Creditors v.

25

Clark (In re National Forge Co.), 344 B.R. 340, 348 (W.D. Pa. 2006) ("Among other

things, courts consider whether all of the defendants were aware of the multiple steps of

the transaction [and] whether each step would have occurred on its own or, alternatively,

whether each step depended upon the occurrence of the additional steps in order to fulfill

the parties' intent."); Hechinger Inv. Co. of Delaware v. Fleet Retail Fin. Group (In re

Hechinger Inv. Co. of Del.), 327 B.R. 537, 546-47 (D. Del. 2005) (collapsing transaction

where the defendants knew about the multiple steps of the transaction, each step of the

transaction would not have occurred on its own, and each step relied on additional steps

to fulfill the parties' intent); Sher v. SAF Fin., Inc., Civ. Action No. RDB 10-1895, 2010

WL 4034272, at *7 (D. Md. Oct. 14, 2010) (same); MFS/Sun Life Trust-High Yield

Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 934 (S.D.N.Y. 1995)

(collapsing LBO where no single transfer would have taken place without the expectation

that the entire transaction would be consummated, and the parties were aware of the

overall LBO).

      Actual knowledge has been found to exist where the "initial transferor was

intimately involved in the formulation or implementation of the plan by which the

proceeds of the loan were channeled to the third-party."  Sunbeam, 284 B.R. at 370;

accord Tabor Court Realty, 803 F.2d at 1302 (lender in an LBO participated in meetings

and "was intimately involved with the formulation of the agreement whereby the

proceeds of its loan were funneled into the hands of the purchasers of the stock of a

corporation that was near insolvency"); Wieboldt Stores, Inc. v. Schottenstein, 94 B.R.

488, 502-03 (N.D. Ill. 1988) (lenders had actual knowledge where they were well aware

of each other's loans, knew that the buyer intended to use the proceeds to purchase the

debtor's shares, received the same information concerning the fraudulent conveyance laws as the board of directors and agreed with the buyer and the board to structure the LBO so as to avoid the fraudulent conveyance laws); see Lippi v. City Bank, 955 F.2d 599, 610 (9th Cir. 1992) (lender knew that proceeds of its loan would be used to make fraudulent transfer and played a role in structuring the transaction).

Constructive knowledge, on the other hand, will be found where the initial transferee became aware of circumstances that should have led it to inquire further into the circumstances of the transaction, but failed to make the inquiry. HBE Leasing, 48 F.3d at 636. The "knowledge" requirement reflects the policy of the Uniform Fraudulent Conveyance Act to protect innocent purchasers for value who receive the debtor's property without awareness of any fraudulent scheme, id., and is closely connected to the requirement of "good faith." See Id. (transferee who gives equivalent value for the debtor's property acts in "good faith" under New York's fraudulent conveyance law if the transferee lacks either actual or constructive knowledge of any fraudulent scheme). The "good faith" inquiry is an objective one that generally asks whether the transferee had information that put it on inquiry notice that the transferor was insolvent, or that the transfer might be made with a "fraudulent purpose," and whether a diligent inquiry would have discovered the fraudulent purpose of the transfer. In re Bayou Group, LLC, 439 B.R. 284, 310-11 (S.D.N.Y. 2010) (discussing 11 U.S.C. § 548(c)[13]) (collecting cases).

---

[13]    Section 548(c) provides a defense to transferees of a fraudulent transfer. It states:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Knowledge of insolvency, however, is insufficient to support a claim of bad faith when

the transfer amounts to a preference that does not affect the debtor's balance sheet or its

ability to meet its other obligations. <u>Atlanta Shipping</u>, 818 F.2d at 249 (construing the

"good faith" element of "fair consideration" under section 272 of the New York Debtor

& Creditor Law[14]); <u>see</u> <u>Sharp Int'l</u>, 403 F.3d at 54 (mere preference paid to non-insider

does not constitute bad faith).

> **5.    The Plaintiff's Collapsing Claims**
>
> **a.    The General Allegations**

While the plaintiff ultimately seeks to avoid and recover the value of the liens

(and proceeds thereof) granted to the Lending Banks in October 2004, the gravamen of

the Scheme Claims attempts to collapse two transfers. In the first transfer, the Lending

Banks advanced proceeds under lines of credit to the debtors, and in the second, the

debtors fraudulently transferred the proceeds to the Fortgang Affiliates. Viewing the first

transfer alone, the Lending Banks gave value, and the advances created valid obligations

owed to the Lending Banks by the debtors. If those obligations are valid, the liens

granted to secure those obligations would not be avoidable constructive fraudulent

transfers. <u>Fabrikant I</u>, 394 B.R. at 732 ("A valid antecedent debt provides adequate

consideration to support the grant of a security interest.") Instead, the granting of a lien

---

[14]    Section 272 states:

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

in those circumstances would be a preference.  <u>Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.</u>, 599 N.Y.S.2d 816, 819 (N.Y. App. Div. 1993).[15]

With the exception of paragraphs 61 and 62, which are discussed below, the TAC fails to identify that first transfer – from the Lending Bank to one of the debtors.  Instead, the TAC highlights the second transfer by the debtors to the Fortgang Affiliate.  For example, TAC Exhibit C, which charts "examples" of the Circular Loans, does not identify a bank loan that was fraudulently reconveyed.  The same holds true for the "Loans" listed on TAC Exhibit B, the "Investment" in Brilliant Trading, the "Due From" obligations and the "Pay Down" transfers.

The TAC's failure to identify the first transfer is a fatal flaw; the Lending Banks made many loans that were not fraudulently retransferred.  The TAC implicitly concedes that some of the Lending Bank advances were reconveyed to the Fortgang Affiliates to pay legitimate business debts.  Moreover, the Scheme Claims account for roughly $97 million, but the unpaid Lending Bank debt aggregated $129.4 million; some 25% of the unpaid debt had nothing to do with the Scheme.  If the total number of loans that the Lending Banks made and the debtors repaid were included, the percentage of non-collapsible loans would be even higher.

In addition, the TAC assumes that the only money that the debtors had to transfer to the Fortgang Affiliates came from the Lending Banks' advances.  However, the debtors' financial statements showed that for the fiscal years ending July 31, 2003, 2004

---

[15]     Admittedly, the granting of liens could still constitute actual fraudulent transfers without regard to the validity of the obligations they secured.  However, the plaintiff has never asserted this theory or alleged facts that support it.

and 2005, when the Scheme was supposedly operating, the debtors had annual sales of
approximately $400 million, and the balance sheets listed current "notes and accounts
receivable" from non-affiliates of nearly $120 million.  (Appendix, Ex. K, at 2-3; Ex. M,
at 2-3; Ex. O, at 2-3.)  In the six months ending January 31, 2006, the debtors' sales
totaled nearly $200 million and the current, non-affiliated "notes and accounts
receivable" exceeded $83 million.  (Id., Ex. P, at 2-3).  The debtors generated substantial
cash from operations, and the assumption that the only cash that the debtors' transferred
to the Fortgang Affiliates came from the Lending Banks' advances is neither plausible
nor logical.[16]

Consequently, Counts I through IV (other than paragraphs 61 and 62) fail to
identify a Lending Bank obligation that may be avoidable, and these Counts may not
even implicate one or more Lending Banks.  Under these circumstances, the allegations
lack the specificity required to support an actual fraudulent transfer claim, FED. R. CIV. P.
9(b), fail to show that the plaintiff is entitled to relief against any specific Lending Bank,
FED. R. CIV. P. 8(a)(2), and fail to provide the Lending Banks with clear notice of what
the plaintiff intends to prove.

Restatement (Second) of Torts § 433B, cited by the plaintiff, does not cure the
pleading defect.  According to the plaintiff, § 433B restates the "bedrock" rule that

---

[16]     In fact, the plaintiff's allegations regarding the Circular Loans depend on MFS's ability to
generate cash from other sources.  According to the TAC, the Lending Banks advanced funds to MFS in
December, and MFS reconveyed the funds to the Fortgang Affiliates during the same month to enable them
to pay off their own bank loans.  The TAC alleges that the Fortgang Affiliates failed to repay most of the
MFS advances, but MFS nevertheless reconveyed "massive amounts" to the Lending Banks each January.
The TAC does not indicate how MFS was able to pay the Lending Banks back each January if the Fortgang
Affiliates were not repaying MFS.  The answer must be that MFS had other sources of cash to repay the
Lending Banks.

"where 'the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.'" (Memorandum of Law in Opposition to Defendants' Motion to Dismiss Third Amended Complaint, dated Mar. 22, 2010, at 21 ("Plaintiff's Opposition") (ECF Doc. # 111) (quoting RESTATEMENT (SECOND) OF TORTS § 433B(3)); see In re Agent Orange Product Liability Litig., 597 F. Supp. 740, 822 (E.D.N.Y. 1984) ("[W]hen all defendants, although acting independently, have breached a duty of care toward the plaintiff but only one of them caused the plaintiff's injury, the burden of proof shifts to each defendant to prove that he or she did not cause the injury. Failure to meet that burden results in joint and several liability with other defendants.")

Section 433B(3) embodies the principle of alternative liability, and reallocates the burden of proving proximate cause. Ryan v. Eli Lilly & Co., 514 F. Supp. 1004, 1016 (D.S.C. 1981). The party invoking the rule "must demonstrate that all possible tortfeasors are before the court; that all have breached a duty toward the plaintiff; that the conduct of one of the defendants has caused his injuries; and that the defendants, as a group, have better access to information concerning the incident than does the plaintiff." New York Tel. Co. v. AAER Sprayed Insulations, Inc., 679 N.Y.S.2d 21, 24 (N.Y. App. Div. 1998). The principle has been applied narrowly:

> The cases thus far decided in which the rule stated in Subsection (3) has been applied all have been cases in which all of the actors involved have been joined as defendants. All of these cases have involved conduct simultaneous in time, or substantially so, and all of them have involved conduct of substantially the same character, creating substantially the same risk of harm, on the part of each actor.

RESTATEMENT (SECOND) OF TORTS § 433B, cmt h; accord In re Methyl Tertiary Butyl

Ether (MTBE) Prods. Liab. Litig., 379 F. Supp. 2d 348, 373 (S.D.N.Y. 2005)

("Typically, alternative liability has been applied in cases where defendants' conduct was

simultaneous in time, was of the same character, and created the same risk of harm, and

where all potential tortfeasors were joined as defendants.")

To the extent that § 433B(3) even applies to pleading, the allegations of the TAC

are insufficient to invoke it.  The TAC essentially alleges that the Lending Banks made

advances to the debtors during a four year period, some but not all of the advances were

fraudulently transferred to the Fortgang Affiliates, and each Lending Bank knew or

should have known that its advance would be fraudulently transferred.  Except for

paragraphs 61 and 62, the TAC makes no attempt to allege that a particular Lending Bank

made a specific advance that was subsequently reconveyed fraudulently with that

Lending Bank's knowledge or consent.  In short, the TAC fails to allege that any Lending

Bank made a specific loan that caused an injury to the debtors.  Instead, it attempts to cast

the burden of disproving the tortious conduct onto the Lending Banks.  But § 433B(3)

does not reallocate the burden of proving tortious conduct; the plaintiff must still allege

and ultimately prove that every Lending Bank committed a tort.

The principle of alternative liability is inapplicable for two additional reasons.

The doctrine requires simultaneous or near simultaneous tortious conduct contributing to

a single injury.  TAC alleges a four year scheme during which each Lending Bank made

discrete advances, separate in time from every other advance, and to the extent an

advance was fraudulently transferred to a Fortgang Affiliate, produced a specific injury.

Furthermore, the plaintiff is in a far better position than the Lending Banks to ascertain

which advances were fraudulently reconveyed.  The plaintiff alone has access to the records of all of the money coming in from the Lending Banks and going out to the Fortgang Affiliates.  Accordingly, the plaintiff's reliance on § 433B(3) lacks merit.

### b.    The Specific Transactions

In <u>Fabrikant II</u>, the Court noted that ¶ 50 of the SAC identified nine sets of two step transactions that "arguably fit within the collapsing paradigm."  <u>Fabrikant II</u>, 2009 WL 3806683, at *13.  The Court directed the plaintiff, if it could, to cull others from the over 6,000 transactions identified in the exhibits to the SAC, and granted leave to replead for that purpose.  <u>Id.</u>  The TAC repleads these same transactions in paragraph 61. However, at oral argument, the plaintiff's counsel conceded that the paragraph 61 transactions did not involve loans to the Fortgang Affiliates that were the subject of Scheme alleged in the TAC.  (Transcript of Hearing, held May 27, 2010 ("Tr. (5/27/10)"), at 34 (Case No. 07-02780, ECF Doc. # 123).)  Instead, they were included to illustrate a pattern.  (Tr. (5/27/10) at 34.)  Ultimately, counsel said that the paragraph can be deleted from the TAC, and focused my attention on paragraph 62.  (Tr. (5/27/10) at 34-35.)

Paragraph 62 allegedly involves ten two-step transactions that were never repaid and should be collapsed.[17]  Two can be eliminated summarily from consideration. Paragraph 62(d) alleges that "[o]n December 31, 2003, $2,400,000 was transferred to Scott Diamond two weeks after a $3,500,000 loan had been taken from Defendant HSBC."  This was one of the Circular Loans, and TAC Exhibit C contradicts the

---

[17]    Paragraph 62 does not allege any loans by BOA.

33

allegation of non-repayment, showing that Scott Diamond repaid MFS on January 5, 2004.

Paragraph ¶ 62(j) alleges that JPMC transferred $2 million to MFS on November 30, 2004, and on the same day, MFS "invested" $3 million. This corresponds to the transfer to Brilliant Trading identified in TAC Exhibit B, and the "Investment" discussed above, that the TAC alleges was never repaid, (¶¶ 4,58), was "ambiguous," (¶¶ 3, 44), and lacked supporting documentation. (¶¶ 58, 62(j).)

These conclusory allegations are contradicted by MFS's January 31, 2005 audited financial statement. It shows that MFS acquired a 50% equity interest in Brilliant Trading Company, LLC, a New York limited liability company with a total equity of $6,499,230. (Appendix, Ex. N, at 10 n.9.) The Brilliant Trading investment is a component of the asset "Investments" listed on MFS's balance sheet. (Id., Ex. N, at 2.) The investment was amply supported by consideration since the value of MFS's 50% interest exceeded what it paid for that interest. Furthermore, the investment was not a loan, and did not create an obligation to repay it on the part of any Fortgang Affiliate.

In addition to these two, paragraph 62(b) alleges that JPMC loaned $8 million to MFS on December 30, 2004, and the next day, MFS loaned a total of $8 million to Am-Gold and Scott Diamond. These are Circular Loans, and TAC Exhibit C amplifies the second part of the transaction. MFS loaned $5 million to Am-Gold and $3.1 million Scott Diamond. TAC Exhibit C shows that Am-Gold repaid its loan (plus an additional

$900,000) on January 22, 2005,[18] and Scott Diamond repaid $2.6 million of the $3.1 million on January 4 and January 31, 2005.

As to the remaining seven transactions, the TAC does not indicate whether the Fortgang Affiliates repaid the debtors following the second step transfer. Even if they did not, and further assuming that the second step constituted a fraudulent transfer, the TAC nevertheless fails to plead the requisite actual or constructive knowledge of the entire Scheme.

The TAC does not allege that the Lending Banks participated in the formulation of the Scheme or were intimately involved in its planning or execution. Furthermore, it does not allege that the Lending Banks expected or intended that the Fortgangs would draw down on the debtors' lines of credit so that the debtors could reconvey the proceeds to the Fortgang Affiliates. Consequently, the TAC fails to allege that the Lending Banks had actual knowledge of the Scheme.

In determining whether the Lending Banks had constructive knowledge, the Court must focus on knowledge relating to the transfer at issue, and not on knowledge that the transferor (i.e., the debtors) was engaged generally in fraudulent activity. See Bayou, 439 B.R. at 311 (discussing inquiry notice under 11 U.S.C. § 548(d)). Thus, the Court must consider whether at the time of making an advance, the Lending Bank should have known that the debtors planned to transfer the loan proceeds fraudulently to one or more of the Fortgang Affiliates, and that the debtor would not have drawn on the line of credit but for that plan.

---

[18]    TAC Exhibit B, which lists unrepaid "loans," indicates that Am-Gold repaid $769,397.44.

According to the TAC, the Lending Banks were familiar with the debtors business and were familiar with the contents of the debtors' financial statements as well as the JPMC Report.  The financial statements show that the debtors conducted a substantial amount of business that generated $400 million in annual sales.  In addition, the debtors transacted hundreds of millions of dollars of jewelry-related business with the Fortgang Affiliates, and the debtors owed the Fortgang Affiliates substantially more than the Fortgang Affiliates owed the debtors.  An advance during this period might pay a business expense to a third party, pay a legitimate business expense owed to one of the Fortgang Affiliates or fuel the Scheme alleged in the TAC.  In short, to the extent there was a Scheme, it is implausible to suggest that every advance was made in furtherance of that Scheme.  Thus, even if the Lending Banks knew or should have known that the debtors were using some of the proceeds to make "bad" loans to the Fortgang Affiliates, the TAC does not allege that any Lending Bank should have known that a particular advance would be "siphoned" off and fraudulently transferred to a Fortgang Affiliate.

Accordingly, the plaintiff fails to plead a collapsing claim with respect to any of the specific two-step transfers alleged in paragraph 62.  In light of this conclusion, it is unnecessary to address the Lending Banks' contention that the confirmed plan's allowance of the same liens and claims held by their transferee precludes the claims asserted in Counts I through IV.  (See Memorandum of Law in Support of Motion to Dismiss Plaintiff's Third Amended Complaint, dated Feb. 19, 2011, at 34 n.26 (ECF Doc. # 107).)

### D.    Counts V through VII

The Consignment Claim, discussed above, involves a different scheme.  The TAC alleges that MFS acquired gold on consignment from SPM between January 16, 2003 and July 31, 2006, and the gold was delivered to the Gold Transferee Affiliates.  On July 31, 2006, MFS borrowed $33 million from Sovereign to pay for $22 million worth of the consigned gold in the hands of the Gold Transferee Affiliates.[19]  The TAC alleges that Sovereign and SPM acted in bad faith because they knew that at least $22 million of the gold "had been delivered to and was in the possession of certain Fortgang Affiliates" and MFS did not receive fair consideration or reasonably equivalent value in exchange for incurring the obligation to buy the gold.  (¶ 125.)  Counts V and VII seek to avoid the obligations to SPM and Sovereign incurred in July 2006 under New York and bankruptcy fraudulent transfer laws, and Count VII seeks to avoid the liens, security interests and proceeds received by SPM and Sovereign in July 2006 to secure the fraudulent obligations.

In <u>Fabrikant II</u>, the Court examined the documents that formed the basis of this claim.  Since 1988, MFS was party to a consignment agreement which was amended in 1998 (the "Amended Consignment").[20]  Pursuant to the Amended Consignment, and with certain limitations and exceptions, the consignor was obligated to deliver gold at MFS's request to MFS's principal office in Rockefeller Center, or other locations approved by

---

[19]    The TAC seeks to avoid the entire $33 million obligation, but does not provide any reason why the $11 million – the portion of the Sovereign loan not used to pay for the consigned gold – should be avoided.

[20]    A copy of the Amended Consignment is annexed as Exhibit F to the <u>Declaration of Arun S. Subramanian in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss</u>, dated Feb. 23, 2009 ("<u>Subramanian Declaration</u>") (ECF Doc. # 77).)

the consignor.  (Amended Consignment ¶¶ 2, 3.)  The consignor retained legal title, and

MFS held the consigned gold in trust.  (Id. ¶ 4.)  MFS had the right to purchase consigned

gold at a price to be agreed upon by the parties that would presumably reflect the price of

gold at the time that MFS exercised the option to purchase, (see id. ¶ 5), and had the

absolute right to return any or all of the consigned gold to the consignor prior to the

termination of the Amended Consignment.  (Id. ¶ 6.)  MFS could use the consigned gold

in the ordinary course of its business, but could not be removed it from its principal office

until the parties had fixed a purchase price.  (Id.)  For thirty days during each fiscal year,

MFS had to pay down the consignment to zero, convert the "outstandings" to forwards

contracts or redeliver the gold.  (Id. ¶ 11(e).)  Upon termination of the Amended

Consignment, MFS was obligated either to redeliver or purchase and pay for all the

consigned gold that had previously been delivered but had not been paid for or returned.

(See id. ¶ 14.)

SPM eventually succeeded to the interests of consignor under the Amended

Consignment.  According to the debtors' January 31, 2006 financial statement, MFS was

then holding $27,936,881 worth of consigned gold which was included in the accounts

payable listed on the balance sheet.  (See Appendix, Ex. P, at 12 n.10.)

On July 7, 2006, SPM, Sovereign and MFS entered into the Eighth Amendment to

Amended and Restated Consignment Agreement Dated as of December 31, 1998.

("Eighth Amendment").[21]  The Eighth Amendment provided for Sovereign to loan $33

million to MFS to enable MFS to purchase 50,760 fine troy ounces of gold that SPM had

---

[21]    A copy of the Eighth Amendment is annexed as Exhibit E to the Subramanian Declaration.

previously consigned to MFS.  (<u>Eighth Amendment</u> ¶ 2.)  In addition, SPM assigned to

Sovereign the security interest that MFS had granted to SPM under the <u>Second and</u>

<u>Amended Security Agreement</u>, dated as of January 13, 2006, as security for MFS's

obligations relating to the amount of gold now being purchased.  (<u>See</u> <u>id.</u> at ¶ 4.)

The elements of a constructive fraudulent transfer claim under bankruptcy and

New York law were discussed in <u>Fabrikant I</u>, 394 B.R. at 734-35.  The TAC adequately

alleges that MFS transferred an interest in property to the Fortgang Affiliates in July

2006.[22]  Prior to the July 31, 2006, SPM held title to the gold, and MFS held the gold in

trust.  By extension, the Gold Transferee Affiliates also held the gold in trust since MFS

could not transfer any more than it owned.  In either case, the gold was encumbered by an

obligation to pay for it or return it.  The July 2006 purchase satisfied that obligation.  The

import of the Consignment Claim is that upon consummation of the July 2006

transaction, MFS indirectly transferred the previously encumbered gold outright to the

Gold Transferee Affiliates.  The effect would be the same if MFS bought $22 million of

gold on the open market and delivered it directly to the Gold Transferee Affiliates.

The TAC also adequately alleges that MFS did not receive reasonably equivalent

value or fair consideration.  The gold was delivered to the Fortgang Affiliates, and MFS

did not receive any direct benefit from the Sovereign loan.  <u>See</u> <u>Official Committee of</u>

<u>Unsecured Creditors v. Citicorp North Am., Inc. (In re TOUSA, Inc.)</u>, 422 B.R. 783, 866

(Bankr. S.D. Fla. 2009) ("As a general rule, an insolvent debtor receives less than a

---

[22]     Under 11 U.S.C. § 101(54)(D), "transfer" means "each mode, direct or indirect, absolute or
conditional, voluntary or involuntary, of disposing of or parting with . . . property; or . . . an interest in
property."

reasonably equivalent value where it transfers its property in exchange for consideration which passes to a third party.") (internal quotations and citations omitted).

Finally, the TAC adequately alleges that MFS was insolvent or was rendered insolvent by the transfer. New York law presumes that the debtor who transfers property without fair consideration is insolvent, and the burden shifts to the transferee to rebut it. Feist v. Druckerman, 70 F.2d 333, 334 (2d Cir. 1934); Geron v. Schulman (In re Manshul Constr. Corp.), No. 97 Civ. 8851, 2000 WL 1228866, at *53 (S.D.N.Y. Aug. 30, 2000); Silverman v. Paul's Landmark, Inc. (In re Nirvana Restaurant, Inc.), 337 B.R. 495, 505 (Bankr. S.D.N.Y. 2006) (discussing the New York Debtor & Creditor Law); Hassett v. Far West Fed. Savs. & Loan Ass'n (In re O.P.M. Leasing Servs., Inc.), 40 B.R. 380, 393 (Bankr.S.D.N.Y.) (same), aff'd, 44 B.R. 1023 (S.D.N.Y.1984), aff'd, 769 F.2d 911 (2d Cir.1985). The same presumption has been applied to constructive fraudulent transfer litigation under 11 U.S.C. § 548. See Mendelsohn v. Jacobowitz (In re Jacobs), 394 B.R. 646, 672 (Bankr. E.D.N.Y. 2008). The plaintiff has pleaded the transfer of property for lack or fair consideration or reasonably equivalent value, and has therefore satisfactorily pleaded insolvency. Accordingly, the TAC satisfies the pleading requirements for step two in the collapsing transaction.

The TAC also adequately pleads step one as against Sovereign. The TAC implies that the consigned gold was sent by SPM directly to the Gold Transferee Affiliates. (¶¶ 3, 44.) The parties entered into the Eighth Amendment for the express purpose of allowing MFS to borrow $22 million from Sovereign to enable it to buy the gold from SPM. Sovereign and SPM are affiliates, and the same individual signed the Eighth Amendment for both. It is reasonable to infer that Sovereign knew whatever SPM knew.

In other words, Sovereign knew that its loan would enable MFS to transfer the consigned

gold outright to the Gold Transferee Affiliates.  The result would be precisely the same if

MFS had transferred the loan proceeds to the Gold Transferee Affiliates who then

purchased the gold on the open market.  Thus, Sovereign had actual knowledge that MFS

would effectively retransfer the proceeds of the Sovereign for no consideration to the

Gold Transferee Affiliates.  See Sunbeam, 284 B.R. at 370 (transferor had actual

knowledge where it "was intimately involved in the formulation or implementation of the

plan by which the proceeds of the loan were channeled to the third-party").

    While the foregoing disposes of Counts V and VI as against Sovereign, the

Consignment Claim leaves unanswered questions.  To begin with, the TAC does not

challenge the obligation that arose when SPM consigned the gold – the obligation

reflected on the debtors' books and records and secured under the January 2006 security

agreement.[23]  In fact, the TAC views the consignments as a legal irrelevancy that created

no obligations.  Instead, Counts V and VII seek to avoid the obligation that arose in July

2006, (¶¶ 151, 157), and Count VII seeks to recover the value of the liens granted in July

2006.  (¶ 162.)  As noted, however, the consignment created the obligation that the July

2006 payment discharged.  MFS did not incur a new debt to SPM at that time, and the

satisfaction of the pre-existing debt to SPM was not constructively fraudulent.  See Sharp

Int'l, 403 F.3d at 54-55.

---

[23]    The TAC alleges that there was never any obligation under the consignment agreements to
purchase the consigned gold.  (¶ 70.)  Though correct, this position interprets "obligation" too narrowly,
focusing exclusively on the purchase obligation.  MFS had two choices: buy the gold or return it.  MFS
could not keep the gold forever without paying for it.

While the transfer might still qualify as an intentional fraudulent transfer, that conclusion is open to question. The fraudulent transfer that underlies the Consignment Claim is MFS's transfer of gold to the Gold Transferee Affiliates in July 2006 through the enabling loan made by Sovereign. The satisfaction of the SPM claim, though related, involves an entirely different transfer from MFS to SPM. At bottom, the plaintiff contends that a seller should be held liable if it knows or has reason to believe that the buyer will fraudulently transfer the goods after the purchase. The plaintiff has not cited any cases that have applied the collapsing paradigm in similar circumstances.

Another key issue concerns the plaintiff's ability to avoid the liens and proceeds thereof under Count VII and recover their value. In the typical fraudulent loan transaction, the debtor incurs the obligation and grants the lien securing the obligation to the same entity at the same time. The same fraud taints the obligation and the lien, allowing a court to avoid both. Here, however, MFS did not transfer a lien to Sovereign at the same time it incurred the obligation that the lien secured. Instead, SPM gave Sovereign the lien that it had acquired six months earlier to secure an obligation that the plaintiff has not challenged. Although the lien may be unenforceable to the extent the obligation to Sovereign is avoided, it does not follow that the lien itself is avoidable under chapter 5 of the Bankruptcy Code, and hence, that the plaintiff can recover the value of the lien under 11 U.S.C. § 550.[24]

In light of the foregoing, the Court will grant the motion to dismiss Counts V and VI as against SPM, and Count VII as to both SPM and Sovereign, with leave to replead

---

[24]     The defendants have argued that the plaintiff is limited to avoiding any liens for the benefit of the estate, 11 U.S.C. § 551, and cannot recover their value under 11 U.S.C. § 550. Sovereign or SPM, or both, can renew that argument in the event the plaintiff repleads the claim presently asserted in Count VII.

within 45 days of this opinion. Given the issues noted above, the plaintiff should allege

its claims against SPM and Sovereign in separate counts.

### E.    Count XII

Count XII, which seeks disallowance under 11 U.S.C. § 502(d), is identical to

Count IX in the SAC. The Court denied the motion to dismiss Count IX in the SAC.

<u>Fabrikant II</u>, 2009 WL 3806683, at *10.

As a result of the foregoing discussion and for the reasons discussed in the next

section of this opinion, the fraudulent transfer claims against JPMC, BOA, HSBC, BL

and ADB are being dismissed with prejudice. Consequently, the TAC also fails to state a

claim against these defendants under § 502(d), and the motion to dismiss Count XII is

granted with prejudice as to these defendants. The Court is also dismissing the fraudulent

transfer claims in Count VII but is granting Sovereign and SPM leave to replead.[25] The

dismissal of Count VII requires the dismissal of Count XII as to Sovereign and SPM, but

the successful repleading of Count VII will also reinstate Count XII as to these

defendants. Finally, the Court denies the motion to dismiss Count XII as to ABN and

IDB for the reasons stated in <u>Fabrikant II</u>, 2009 WL 3806683, at *10.

### F.    Leave to Replead

Except for Counts V, VI and VII, the dismissal of the various claims is with

prejudice. As a rule, a Court has the discretion to deny a motion to amend upon a finding

of futility, bad faith, undue delay or undue prejudice to the opposing party. <u>Jin v. Metro.</u>

<u>Life Ins. Co.</u>, 310 F.3d 84, 101 (2d Cir. 2002). In addition, a Court may deny leave to

---

[25]    Section 502(d) only pertains to voidable transfers, not voidable obligations. <u>In re Asia Global
Crossing, Ltd.</u>, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005).

replead where it has previously identified the deficiencies in a pleading, but the deficiencies persist in subsequent pleadings.  See, e.g., Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 168 (2d Cir. 2003) (no abuse of discretion to deny leave to replead in light of "repeated failure to cure deficiencies by amendments previously allowed") (internal quotation marks omitted); Armstrong v. McAlpin, 699 F.2d 79, 93-94 (2d Cir.1983) (district court did not abuse discretion in denying leave to amend where plaintiff already had one opportunity to plead fraud with greater specificity); Denny v. Barber, 576 F.2d 465, 470-71 (2d Cir. 1978) (denying leave to amend the complaint a second time where the district court put the plaintiff on notice of the deficiencies in the complaint); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982) (finding that the district court did not abuse its discretion in denying leave to amend the complaint a third time to restate defective allegations).

The Court has already given the plaintiff an opportunity to cure the deficient allegations of intentional fraudulent transfer in Counts VIII through X (Subsequent Transfer Claims).  The Court dismissed identical allegations in the SAC after noting the deficiencies, and the plaintiff simply repleaded the same claim in the TAC.  Similarly, in dismissing the SAC, the Court identified the specific deficiencies regarding the failure to allege standing to assert the preference claims, but the TAC failed to cure them. Furthermore, the preference claims are time-barred, and any attempt to replead them would be futile.

Finally, the plaintiff has failed, despite several attempts, to allege cognizable collapsing claims in Counts I through IV.  Fabrikant II identified numerous deficiencies

with the Scheme Claims mostly emanating from the plaintiff's "net transfer" theory.  The plaintiff did not attack any specific two-step transactions that fit the collapsing paradigm (other than the allegations now incorporated in paragraph 61 of the TAC).  The Court directed the plaintiff to cull other transactions from the its 157 page schedule that satisfied the collapsing paradigm.

Instead of following the Court's direction, the plaintiff simply eliminated the lengthy exhibit.  Thus, with the exception of paragraph 62, the TAC again fails to identify any transfer from a Lending Bank, and simply lumps all of the Lending Banks together without any effort to differentiate what each one did.  Furthermore, Counts I through III continue to assert that all of the unpaid obligations to the Lending Banks are avoidable, adhering to the "net transfer" theory.  Given the plaintiff's failure to cure the deficiencies noted in <u>Fabrikant II</u>, I decline in the exercise of discretion to give the plaintiff another chance to plead its Scheme Claims.

The parties are directed to settle an order on notice consistent with this opinion.

Dated: New York, New York
         January 25, 2011

                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge